1  OFFICE OF THE GENERAL COUNSEL
   SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT
2  THOMAS C. LEE (SBN 104624)
   VICTORIA R. NUETZEL (SBN 115124)
3  300 Lakeside Drive, 23rd Floor West
   Oakland, CA  94612-3534
4  Tel:  (510) 464-6023
   Fax:  (510) 464-6049
5  EMAIL:  VNUETZE@BART.GOV

6  Attorneys for Defendant
   San Francisco Bay Area Rapid Transit District
7

8

9                  IN THE UNITED STATES DISTRICT COURT
10
                 NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO
11

12

13
   PAUL MELKER,                          Case No.:  C07-03762 MMC
14
              Plaintiff,
15                                        DECLARATION OF VICTORIA R.
                                          NUETZEL IN SUPPORT OF MOTION
16      vs.                               NOTICE OF MOTION AND MOTION FOR
                                          SUMMARY JUDGMENT (FRCP Rule 56)
17
                                          DATE:  June 27, 2008
18  SAN FRANCISCO BAY AREA RAPID          TIME:    9:00 a.m.
    TRANSIT DISTRICT,                     COURTROOM: 7
19
              Defendant.
20

21

22      I, VICTORIA R. NUETZEL, state:

23      1.      I am an attorney licensed to practice law before this Court.  I am an attorney with the

24  Office of the General Counsel of the San Francisco Bay Area Rapid Transit District (BART), counsel

25  of record for defendant BART in this action.

26      2.      Plaintiff, Paul Melker, through his union, Service Employee's International Union

27  Local 1021 (then 720) ("SEIU") filed a grievance related to his termination.  The Office of the General

28  Counsel represented BART.  Ann Yen of Weinberg, Roger & Rosenfeld represented Mr. Melker.

- 1 -

3.     The parties jointly agreed on Alexander Cohn as the arbitrator and the matter proceed to arbitration on April 26, 2006.   As noted, both Mr. Melker and BART were represented by counsel at the arbitration and both parties had the right to call and cross–examine witnesses.  The entire proceeding was recorded and transcribed by a certified court reporter.

4     Mr. Cohn issued his decision on or about July 24, 2006.  The arbitrator found that Melker had violated the terms of the rehabilitation agreement but, because there was evidence of confusion regarding Melker's final return to work date, he ordered Melker reinstated and the termination converted to an approximately 15 month suspension without pay or benefits.  A true and correct copy of the arbitration decision is attached hereto as Exhibit A.

5.     Melker was reinstated as a Utility Worker.  Melker claimed that he should have been reinstated as a System Service Worker.  Counsel for Melker and BART submitted this issue to the arbitrator pursuant to his continued jurisdiction related to the arbitration remedy.  The arbitrator stated that Melker was to be reinstated as a Utility Worker.  A true correct copy of correspondence from the arbitrator regarding this issue is attached hereto as Exhibit B.

6.     On March 27, 2008, I took the deposition of plaintiff, Paul Melker.  Attached hereto as Exhibit C are true and correct copies of pertinent portions of Melker's deposition testimony.

I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct, is within my personal knowledge and if called upon to testify I could testify competently thereto.

Executed this 19th day of May, 2008 at Oakland, California

_____
Victoria R. Nuetzel

# NUETZEL EXHIBIT A

1  ALEXANDER COHN
   Arbitrator - Mediator
2  P.O. Box 4006
   Napa, CA 94558.
3  (707) 226-7096

4

IN ARBITRATION PROCEEDINGS PURSUANT TO

5

AGREEMENT BETWEEN THE PARTIES

6

7  In the Matter of a Controversy                          )

8                    between                               )
                                                           )
9  **SERVICE EMPLOYEES INTERNATIONAL UNION,**              )        **ARBITRATOR'S**
   **LOCAL 790,**                                          )
10                                                         )        **OPINION AND AWARD**
                                                           )
11                    and                                  )
                                                           )
12 **SAN FRANCISCO BAY AREA RAPID TRANSIT**                )
   **DISTRICT.**                                           )
                                                           )
13 Involving the discharge of Paul Melker, Grievant.       )
   Case No. 910-06                                         )
14

15         This Arbitration arises pursuant to Agreement between SERVICE EMPLOYEES

16 INTERNATIONAL UNION, LOCAL 790, hereinafter referred to as the "Union," and the

17 BAY AREA RAPID TRANSIT DISTRICT, hereinafter referred to as the "District," under

18 which ALEXANDER COHN was selected to serve as sole, impartial Arbitrator and

19 whose decision shall be final and binding upon the parties.

20         Hearing was held on April 26, 2006, in Oakland, California. The parties were

21 afforded full opportunity for the examination and cross-examination of witnesses, the

22 introduction of relevant exhibits and for closing argument. The Union argued its case

23 orally at the end of the hearing outside the presence of the District and the Arbitrator.

24 The District filed a post-hearing brief which was received on June 17, 2006, and the

25 matter was submitted.

26 / / /

27 / / /

28 / / /

1  APPEARANCES:

2      On behalf of the Union:

3          ANN YEN, Esquire, Van Bourg, Weinberg,
           1001 Marina Village Parkway, Suite 200,
4          Alameda, California 94501-1091

5      On behalf of the District:

6          MARCO GOMEZ, Esquire, Office of the
           General Counsel, BART, 300 Lakeside Drive,
7          P.O. Box 12688, Oakland, California 94604-
           2688.

8

9                          **ISSUE**

10     Whether the District discharged Grievant for just cause; and
       if not, what is the appropriate remedy?

11

12          **RELEVANT PROVISIONS OF AGREEMENT**

Section 1.0.  Mutual Agreements

13

1.1 Mutual Rights & Responsibilities

14

...Management has the duty to execute the traditional responsibilities of Management
15  to attain this goal and the Unions recognize the Management responsibilities.
    Management, in turn, recognizes its responsibility to treat employees fairly and
16  equitably.

17  1.5 The District agrees that, as a result of signing of this Agreement, rules or regulations
    or practices affecting employees beneficially will not be changed without mutual
18  agreement.

19      . . .

20  2.1 Union Recognition

21  ... The District recognizes [the Union] as the sole and exclusive bargaining agent for
    employees in the Clerical and Maintenance Subunits...

22

23      . . . .

24                          **FACTS**

25      The salient facts are not in dispute. On March 12, 2001, Grievant was hired by

26  the District and, at the time of his discharge, was classified as a Transit Vehicle Car

27  Cleaner. On December 2, 2004, Grievant "self-referred" by going to Margaret Saget,

28  Senior Employee Services Representative, and advising her of his need for help

                              2

1  because of his suffering a life with drugs.

2      The District has an alcohol and drug policy called the Substance Abuse Program

3  ("SAP"). Among other things, the SAP has Substance Abuse Testing Procedures[1]

4  which, in part, provide:

H.    VOLUNTARY SELF-REFERRAL FOR SUBSTANCE ABUSE
      REHABILITATION

An employee who has a drug and/or alcohol problem ... can voluntarily refer
him/herself to the District's [SAP] for treatment through the Employee Services
Manager. The Employee Services Manager will evaluate the employee and make
a specific determination of appropriate treatment. An employee pursuant to this
program, who is in a rehabilitation or aftercare program, or who has completed
two (2) rehabilitation programs, may not elect further rehabilitation under this
program.

PROCEDURES

1.    Once an employee voluntarily self refers, the Employee Services Manager
      will remove the employee from performing his/her job pending an
      evaluation. The employee will remain in a full pay status during the
      evaluation and treatment program.

2.    Employee signs the Rehabilitation Agreement

      . . .

9.    The employee must successfully adhere to the terms and conditions of the
      Rehabilitation Programs. If the employee violates the terms and conditions
      of the Rehabilitation or Return to Work Agreement, the employee will be
      subject to disciplinary action in accordance with the terms of these
      agreements.

On December 3, Grievant voluntarily entered the Rehabilitation Program. On

December 8, the District sent a 3-party Rehabilitation Agreement to Union President

Roxanne Sanchez. On December 13, Saget, for the District, and Grievant signed the

Rehabilitation Agreement. Neither Sanchez nor any other Union representative signed

it. The Rehabilitation Agreement provides:

This letter shall constitute a rehabilitation agreement between Mr. Paul Melker,
Transit Vehicle Car Cleaner, SEIU Local 790, and the Bay Area Rapid Transit
District (hereinafter "Rehabilitation Agreement"), setting forth the terms and
conditions of Paul Melker entering the District's Voluntary Substance Abuse
Rehabilitation Program on December 3, 2004.

---

[1]See, JX-G.

I, [Grievant], <u>with the concurrence of my union representative</u>, agree to the following:

(1 )To execute appropriate authorizations for use and disclosure of medical information to permit the District's authorized treatment facility, New Bridge, to disclose my medical information to the District and to permit the District to disclose my medical information to [Saget], for the purposes of administering the [SAP] and determining my fitness for duty.

To keep such authorizations current during all phases of the [SAP] as it pertains to me, including the aftercare, monitoring and disciplinary phases, if any.

(2) I recognize that I have a chemical dependency problem. The Substance Abuse Rehabilitation Program of New Bridge has evaluated my particular circumstances, and has recommended that I be referred for Inpatient treatment to assist in my recovery.

(3) I agree to execute an admission agreement and to enter into New Bridge Rehabilitation Program on December 3, 2004; and to execute any treatment agreements required by the rehabilitation program, to fully adhere to the terms and conditions of the treatment agreements and to fully participate in the treatment program.

I understand that my treatment agreement is subject to reevaluation and/or modification by New Bridge with the concurrence of the Employee Services staff during the course of my treatment.

(4) Without limiting the foregoing, I agree to refrain from the use of all prohibited substances and alcohol under the program and to participate fully in all activities assigned or required by New Bridge as part of the treatment program including, but not limited to, individual, group and family counseling sessions, 12-step meetings, educational sessions and recreational and other activities as assigned. I agree to participate in case conferences which can be called at the request of the treatment staff, District Employee Services Manager, Senior Employee Services Representative or myself.

(5) I understand that my initial enrollment in the Rehabilitation Program will be for a four week period. I understand that the initial enrollment period may be extended by New Bridge <u>and approved by the District for up to an additional 90 days total</u>. However, I further understand that my entitlement to benefits under the Voluntary Rehabilitation Program is contingent upon my compliance with the Program and if in the judgement of the Rehabilitation Program staff or the District ESA, I fail to comply, my benefits under the District Program will be revoked.

(6) I agree to successfully complete the New Bridge Treatment Program, as evidenced by a final written evaluation to that effect to be furnished by New Bridge directly to the District.

(7) <u>I agree that anyone of the following shall be grounds for termination</u>, and the District may immediately suspend me without pay and without a prior hearing and implement discharge proceedings for:

- failure to participate fully in the New Bridge Rehabilitation Program
- failure to successfully complete the Program
- violation of any terms or conditions of the Treatment Contract

1

2    <u>Any such disciplinary action will be subject to the grievance procedure</u> of the
     Collective Bargaining Agreement.

3    (8) I understand that should I successfully complete the New Bridge
     Rehabilitation Program and should the District receive a written evaluation to that
4    effect I will be expected to enter into a written agreement (Monitoring and Re-
     Entry Agreement) requiring adherence to aftercare and monitoring terms and
5    conditions recommended by New Bridge and approved by the District's Employee
     Services Manager which may include, but not be limited to, periodic scheduled
6    and unscheduled urinalysis for the presence of prohibited drugs or alcohol for a
     period of time recommended by the District's Employee Services Manager.

7
     My ultimate return to work will be contingent upon my having successfully
8    adhered to the terms of the Rehabilitation Agreement, testing negative on a
     return to work drug and alcohol test, being otherwise fit for duty and upon my
9    entering into a written Return to Work Agreement which will provide that failure
     to adhere to its terms will result in termination of my employment with the District.
10   (Emphasis added)

11   According to Grievant, Saget did not go over the Rehabilitation Agreement "line-

12   by-line." Saget testified that they went over the Rehabilitation Agreement "line-by-line."

13   Subsequently, the District determined that Grievant had not complied with the

14   Rehabilitation Agreement. On April 26, 2005, Manager of Rolling Stock and Shops Jeff

15   Baker wrote[2] Grievant notifying him of the District's intent to Discipline/Discharge him,

16   stating in pertinent part:

17   Please be advised that pursuant to the Rehabilitation Agreement you signed with
     the District on December 13, 2004, you were required to adhere to all of the
18   terms and conditions per Section C. 6 of the Rehabilitation Programs of the
     District's [SAP] as delineated in the Agreement. Having failed to have met those
19   terms and conditions, as illustrated below:

20   1. After being granted a transfer to the Kaiser Treatment Program, you failed to
     participate fully in treatment activities or complete the Program;
21
     2. You were absent from the Treatment Program without permission and without
22   notifying the Senior Employee Services Representative beginning on March 21,
     2005; and
23
     3. You refused to take a Return to Work test by April 8, 2005, as required.
24
     Section C. 6. of the Policy states:
25
     The employee must successfully adhere to the terms and conditions of the
26   rehabilitation and aftercare programs. If the employee violates the terms and
     conditions of the rehabilitation or aftercare program, the employee will be subject
27

28   ─────────────
     [2]See, JX-C

1  to disciplinary action in accordance with the rehabilitation agreement, up to and
2  including discharge.

3  Due to the above-stated violations and pursuant to the state Policy, the District is seeking to terminate your employment.

4  On June 2, a grievance[3] was filed seeking Grievant's reinstatement. The

5  grievance alleged the discharge violated Sections 1.1, 1.5, 2.1 and all other applicable

6  sections of the Agreement. The grievance also asserted:

7  Grievant entered into an agreement with the District without notification or representation of Union, agreement states it was a 3 party Agreement, but there

8  was no Union concurrence. Grievant complied with return to work testing, but was refused due to lack of I.D. He returned the following day and passed, proving fit

9  for duty. The District unjustly discharged Grievant violating the Agreement, p. 3.

10  Saget oversees the SAP which, among other things, provides that: (1) the District

11  shall pay for the treatment of an employee making voluntary self-referral and continue

12  their salary; (2) such employees must sign a rehabilitation agreement about their

13  rehabilitation treatment; and, (3) upon returning to work, the employee must take a drug

14  and alcohol test. Saget testified that she is responsible for evaluating the employees

15  entering the SAP and assigning them the applicable level of rehabilitation care; that she

16  first saw Grievant when he self referred on December 2, 2004; that he had problems

17  with cocaine while in a Kaiser treatment program; that she evaluated him and

18  recommended that he participate in a residential program at New Bridge in Berkeley;

19  that Grievant agreed and started the next day; that, on December 13, she and Grievant

20  went over the rehabilitation agreement[4] "line-by- line" and he signed it; that he

21  expressed no questions or concerns about that agreement; that the New Bridge program

22  he was in was to last 28 days; and, that she received weekly reports from New Bridge

23  as to Grievant's participation.

24  Saget also testified that towards the end of December Grievant called her while

25  he was in New Bridge day treatment; that he requested a transfer into day treatment at

26

27  [3]See, JX-B.

28  [4]See, JX-F

6

1  Kaiser because he felt he needed to be in a group that had more long term recovery

2  than those in the New Bridge program; that Grievant also wanted to spend more time

3  with his son; that she spoke to the New Bridge counselors and shared concerns about

4  his request; that New Bridge told her their concerns involved relationship issues

5  developing in his treatment involving another participant; that she discussed those

6  concerns with Grievant; that he denied those concerns; that she approved his transfer

7  to Kaiser; that she called Kaiser about his participation; and, that Kaiser

8  psychologist/counselor Jody Binkoff told her there were problems between Grievant and

9  another client and Kaiser wanted to discharge him from their program.

10  According to Saget, on February 2, 2005, she told Grievant he had completed

11  treatment and he should take a return to work substance test and go back to work; that

12  he agreed to take the test, but called her several days later saying he had relapsed and

13  had not taken the test; that she told him to wait a week for his system to be clean and

14  then take the test; that Grievant said he would; that based upon her office's paperwork

15  she determined Grievant did not take that test; that she called Grievant on or about

16  February 16 and told him he needed to take a return to work test; that Grievant angrily

17  told her she was trying to get him fired and hung up; that later that day she was called

18  by Sanchez (with Grievant on the line) , who said she needed her to give Grievant 90

19  days off under the SAP; that Grievant's position may be RIF'd; that Grievant had a

20  second job; that Grievant needed that opportunity to finish the treatment program; that

21  she told Sanchez Grievant had to be actually enrolled in a treatment program; that it was

22  ultimately agreed Grievant could stay off work if he was in treatment; that she advised

23  Grievant he could participate in a program run by New Bridge, or two run by Kaiser; and,

24  that Grievant selected the Kaiser program in Richmond.

25  Saget also testified Richmond Kaiser did not regularly supply her with information

26  about Grievant's treatment; that a counselor at Richmond Kaiser told her he went there

27  the first of March, but did not stay there long; that a Richmond Kaiser counselor told her

28  Grievant had transferred to Oakland Kaiser because he did not like the Richmond

1   services; that on March 27 she contacted Oakland Kaiser and was told by Binkoff that

2   Grievant had been there one day, March 18, but called in sick two days and has not

3   been heard from since; that she was never informed how many days he was in

4   treatment in Richmond; that she called Grievant and said his administrative leave of 90

5   days would be up April 7 and he needed to be tested so he could go back to work no

6   later than Monday, April 11; that Grievant said he would so comply; that Grievant called

7   April 4 and requested more time; that she told him she could not give him an extension

8   on the administrative leave and he needed to come in and be tested; that Grievant

9   called her April 5 and said if he could not get a leave of absence he thought he would

10  resign; that she said that would be fine; that Grievant called back that afternoon

11  demanding a letter stating the date he had to be tested; that she said she would not

12  send him a letter; that she told him he had to be tested by April 8, the last possible date;

13  that his return to work, based upon that test result, would be pushed back into the

14  middle of the following week; that Grievant did not come in for the test on April 8; that

15  she called Sanchez at the end of March to say they were having problems with Grievant;

16  that she called Sanchez April 11 or 12 and told her Grievant had not come in to be

17  tested and she was going to turn the matter over to Labor Relations; and, that she so

18  notified Labor Relations about Grievant not coming in to be tested April 8 .

19          According to Saget, it was not necessary to provide Grievant a letter setting the

20  return to work testing deadline because he was required to take the test when

21  requested; that by April 5 it was too late to send such a letter; that it was clear he had

22  to take the test by April 8; that she had told him that several times over the prior two

23  weeks; that there is no practice of providing such written notice; that the extension of the

24  date to April 8 was one day over his 90 day administrative leave; that leave was 90 days

25  from the date of the rehab agreement when he went into treatment; that Grievant was

26  not given a separate document setting that date; that the four week treatment was part

27  of the 90 day administrative leave; that the SAP clearly puts the administrative leave at

28  a maximum of 90 days; that Grievant came to see her after she had referred the matter

1   to Labor Relations; that she told him he should go into a long term treatment program;

2   that she did not recall discussing that matter with Binkoff; that her investigation of

3   Grievant's participation at Richmond Kaiser determined he called in sick twice and was

4   never heard of again; that meant he was not participating; that it was not necessary for

5   her to investigate his illness claim; that, since 2000, she was responsible for

6   administrating rehabilitation programs and took over the entire program in December

7   2004; that she was unaware of any employee having more than 90 days administrative

8   leave; and, that it may have happened.

9        Grievant testified that, In December, 2004, he had been in a Kaiser outpatient

10  chemical dependency program and was in satisfactory employment standing; that he

11  understood from Saget his administrative leave was four months; that when he

12  transferred to Kaiser Saget never said when his administrative leave would end; that he

13  successfully participated in Kaiser until February 4th, when he had a relapse; that he told

14  Saget about his relapse and needing more help and time; that Saget told him his

15  administrative leave was almost up; that she did not specify the end of that leave; that

16  he did not know he could use his own health insurance for a residential program and

17  Saget did not tell him; that he attended the Kaiser Richmond program sometime in

18  February 2005 for approximately three weeks after his relapse; and, on February 7,

19  2006, Binkoff sent a letter to Grievant which provided:

20      I am providing this letter at your request regarding your attendance at the CDRP
        [Kaiser] .You came for a screening appointment on November 23, 2004 and
21      attended Phase 1 of the Day Treatment program through November 30. You did
        not enter Phase 2 on the Day Treatment program, but did leave a message that
22      you planned to enter a residential treatment program offered through your
        employer. On January 25, 2005 you came for another screening appointment
23      and began Phase 1 of Day Treatment on January 26. You terminated your
        treatment here on February 9 because you expected your health care coverage
24      to change. On February 23 you reported that your EAP advised you to return to
        treatment. You agreed to meet with her regarding referrals because returning to
25      Oakland CDRP at that point was not clinically indicated. (Due to a conflict of
        interest with another client here, our staff advised that you not attend the same
26      facility at the same time) On March 16 you requested to restart Phase 1. On
        March 17, our program director advised you that would be possible if the client
27      with whom you had the conflict of interest was no longer in treatment here.
        Otherwise, we advised you to continue at Kaiser Richmond where you reportedly
28      had been in treatment for 3 weeks. On March 18, you were invited to start Phase

                                          9

1 the next day. You did not attend on March 19, but did restart on March 21. On March 22 you called in sick and stated you planned to return on March 23. You did not return to CDRP after that. Your last attendance at CDRP was March 21, 2005 in Phase I of Day Treatment. With your consent, I spoke with your EAP on April 14 to provide her with the above information. She stated that she planned to meet with you to advise referral to a 6-month residential treatment program.[5]

Grievant further testified that after attending Richmond Kaiser he told Saget he needed to go into an inpatient program; that Saget told him his administrative leave was almost up, but did not specify the date that would occur, nor did she make any treatment suggestions; that, during the February conference call with Saget and Sanchez, Saget was unconcerned about his well being; that she said his leave was almost up and he had to return to work; that no return date was mentioned; that Saget said he could stay on leave if he was enrolled in a verifiable program; that arrangement was not made in writing; that the Union asked about his having more time to get into a program if Grievant paid for it; that Saget repeated his administrative leave was almost up; that the Binkoff reference in UX-2 to restarting phase 1 on March 16 was due to his relapse; and, that he signed a release for Saget to get information about that treatment.

On March 20, Saget signed a Kaiser substance abuse testing form.[6] Grievant testified that the stated reason for the testing on the form was "return to work"; that the form did not have either the date for testing or his date to return to work; that Saget told him on approximately March 22 the return to work test had to be by April 8; that he did not take the test April 8 because he was ill; that he was treated at Kaiser emergency room on March 27,[7] for strep throat with 600 mgs. ibuprofen every 8 hours and to return if condition worsened; that he remained ill until April 8 or 9 and he called in every day of that illness; that he was never asked for documentation of that illness; that he took

///

---

[5] See, UX-2. According to Grievant, Binkoff's February 7 letter shows he attended the Kaiser Richmond program in February 2005 for approximately three weeks.

[6] See, UX-4.

[7] See, UX-3

1    a return to work test on April 12, which was reported negative[8]; that he never said he did

2    not want to complete his rehabilitation nor did he ever say he did not want to return to

3    work with the District; and, that he re-entered the New Bridge program in December

4    2005 as a result of receiving benefits at his other employer Summit Alta Bates.

5         According to Grievant, Saget did not give him a direct order to take the test April

6    7 or 8. He testified that she never told him if he did not take the test it would be

7    considered insubordination; that she never told him he would lose his job if he took the

8    test later; that in reference to the April 7 or 8 deadline Saget said "the administrative

9    leave is almost up, you are going to have to take a return to duty analysis testing"; that

10   at the end of the February 16 conference call he did not have any understanding when

11   his leave would be over; that he still believed it was four months based on what Saget

12   had first told him back in December; and, that he was afraid that the medication he had

13   been given by the emergency room on March 27 would throw off his return to work test

14   results.

15        Grievant further testified that he stopped going to Kaiser Oakland in the beginning

16   of February 2005 because of a conflict with another patient there; that later in February

17   Saget talked about his return to duty test, which he told the Union about; that he did not

18   think Saget was denying him the ability to get back into treatment after his relapse; that

19   after he left Kaiser Oakland, he went to Kaiser Richmond; that he was in Kaiser

20   Richmond at the time of the February 16 conference call with the Sanchez and Saget;

21   that during that phone call Saget gave him no treatment options; that he made the

22   transfer from Oakland to Richmond without talking about it first with either Saget or

23   anyone in District management; that he told Saget about his transfer during the February

24   16 conference call; that, in that conversation, Saget told him he had to remain in

25   treatment; that he later transferred back to Kaiser Oakland; that, contrary to her

26   testimony, he talked to Saget about that transfer; that he showed up about three days

27

28   [8]See, UX-4.

11

1  in March at Kaiser Oakland, when he was not sick; that Saget told him he had to take

2  a return test by April 7; that she never extended it to April 8; that on December 13 Saget

3  said he had 4 months administrative leave; that she did not go over the Rehabilitation

4  Agreement with him line-by-line; that during the February 16 conference call Sanchez

5  asked Saget to give him the 90 days he was entitled to under the SAP; and, that Saget

6  agreed so long as he was in rehabilitation.

7    Grievant also testified that along with the ibuprofen he was given a shot by the

8  emergency room doctor on March 27 for his pain; that he did not know what the drug(s)

9  were in that shot; that his pain from then on kept him from taking the return to work test

10  on April 7 or 8; that he is unfamiliar with ibuprofen; that he knows "it is a pain killer,

11  which is probably a narcotic"; that Saget did not allow him to tell her that the prescription

12  medication would keep him from taking the test; that his other job did not provide a paid

13  EAP like the District's; that he did not have any benefits at the other job; and, that all his

14  benefits were through the District.

15    On April 19, 2006, New Bridge Aftercare Counselor Teresa Allen sent Union

16  Counsel Ann Yen a letter[9] stating that Grievant "successfully completed 28 days of

17  chemical dependency treatment" on January 6, 2006; that Grievant "now regularly"

18  attends aftercare sessions; that "his drug screen tests have all been negative"; and, that

19  Grievant is scheduled to graduate from the aftercare program in January 2007.

## POSITION OF DISTRICT

21    The grievance should be denied because Grievant was discharged for just cause.

22  Grievant was given <u>numerous</u> opportunities to participate and comply with the SAP. He

23  is not entitled to an additional chance. He had four months of paid administrative leave

24  during this period, during which he had wilful transgressions, which cannot be ignored.

25    Grievant violated his treatment program. After completing and being discharged

26  from his Kaiser treatment, Grievant, who had been on administrative leave since

28  [9]See, UX-1.

12

1     December 4, 2004, was directed by Saget on February 2, 2005, to prepare to return to

2     work including a return to work drug test. Although, Grievant agreed , a few days later

3     he called Saget saying he had relapsed. Saget advised he could take the drug test a

4     week later to let his system clear of any drugs. Grievant told Saget he would and again

5     failed to take the drug test. His failure to take that test violated the SAP and his

6     Rehabilitation Agreement. Grievant was given <u>another</u> chance as a result of the Union's

7     intervention on his behalf and Saget agreed to his going back into actual, verifiable

8     rehabilitation participation. Saget gave him the choice of Kaiser Richmond or another

9     rehabilitation program. Grievant choose Kaiser, but by March 3, he transferred to Kaiser

10    Oakland, without informing her. Saget found out he participated one day at Kaiser

11    Oakland, called in sick and never participated there again.

12        The SAP requires that Grievant adhere to the terms of his Rehabilitation

13    Agreement (JX-G, H (8) ). It also provides that Saget determines the rehabilitation. By

14    unilaterally changing his treatment and wilfully failing to go to rehabilitation, Grievant

15    failed to comply with the terms of his participation under both the SAP and the

16    Rehabilitation Agreement. Saget did not then seek his discharge, but sought to get him

17    back to work. Grievant admitted that, on March 22, 2005, Saget told him his

18    administrative leave was running out and he had to take a return to work drug test April

19    7 in order to be timely under the program. Although scheduled for the test, Grievant did

20    not take it as scheduled, but unilaterally changed the date and took it days after that

21    deadline.

22        Grievant's excuses are not credible. He blamed Saget as unhelpful. He has

23    refused to accept responsibility. His assertion Saget said his leave was 4 months is false

24    and a means to avoid the April 7 drug test. The Rehabilitation Agreement was gone over

25    line by line with Grievant by Saget. It provides 90 days as the <u>maximum</u> leave period.

26    The SAP has a similar provision. That was reiterated by Sanchez in his presence is her

27    oral agreement with Saget giving Grievant another chance. Grievant failed to comply

28    with the terms of his treatment. He lied about the length of his treatment at Kaiser

1    Oakland in March. He said he did not take his April 7 testing because he had been sick

2    with strep throat. He changed that excuse to his treatment with ibuprofen and a shot for

3    that illness, which somehow would adversely effect his drug test results. At the time, he

4    did not tell Saget of those problems.

5        Any Union request for mitigation should be denied. There is no requirement in the

6    SAP, mutually agreed to by the parties, requiring the Union to sign the Rehabilitation

7    Agreement. Rather, the SAP provides the employee signs the Rehabilitation Agreement.

8    It was sent to the Union in letter form consistent with years of practice. Grievant's post

9    discharge rehabilitation participation should not be considered as mitigation grounds.

10   He had many rehabilitation opportunities in the District program. He was terminated for

11   <u>wilfully</u> not complying with his obligations in the District program.

12

13                              **POSITION OF UNION**

14       The grievance must be sustained and Grievant reinstated and made whole[10]

15   because the District has failed to demonstrate the discharge was for just cause. Grievant

16   <u>voluntarily</u> referred himself into the SAP. He should not be treated as if he was on his

17   last chance. The District should have cooperated more with him to help him recover from

18   his addition.

19       Grievant did not violate the terms of his Rehabilitation Agreement. That

20   agreement provided for a 4-week period of rehabilitation, which could be extended up

21   to an additional 90 days. Grievant completed the 28 day residential New Bridge

22   program. That was followed by a 17 day out patient program at New Bridge for a total

23   of 45 days. Therefore, Grievant complied with paragraph 6 of the agreement. Paragraph

24   7 stated grounds for termination would include failure to fully participate or successfully

25   complete the New Bridge program or violation of any terms or conditions of the

26   treatment agreement. He complied with all those provisions.

27

28   _____

     [10]In addition, interest should be awarded.

1    There was an oral extension to that agreement between the Union (Sanchez),

2   Saget and Grievant to continue Grievant on administrative leave while he participated

3   in further rehabilitation. Those terms were unclear and, therefore, cannot constitute just

4   cause for Grievant's termination. It was unclear how long Grievant could remain on

5   administrative leave while in treatment. Grievant understood Saget had earlier told him

6   in December his administrative leave was for 120 days. That is contrary to the District

7   position such leave could not be longer than 90 days. Saget conceded there may have

8   been <u>longer</u> rehabilitation leaves for employees in the past. Paragraph 5 of the

9   Rehabilitation Agreement indicates, consistent with Grievant's testimony, the total leave

10   could be 120 days if 4 weeks were added to the 90-day extension.

11    The extension agreement was unclear as to the beginning and ending dates of

12   Grievant's leave, nor was Grievant ever provided such information. It was unclear as to

13   what Grievant was expected to do other than stay in treatment. Also, it was unclear what

14   information Grievant was to provide Saget as opposed to the information Kaiser was to

15   supply her. Grievant did stay in treatment within the reasonable purpose and meaning

16   of the oral extension. He spent three weeks in Richmond Kaiser. He suffered a relapse

17   and was not in treatment every day between February 16 and April 26. He told Saget

18   of that relapse and asked for her help. She should have been more cooperative and

19   provided him assistance because he had voluntarily self referred.

20    After attending Richmond Kaiser for three weeks in February/March he attended

21   more than one day in Kaiser Oakland, although Kaiser's records show only one days

22   attendance. On March 16 he completed Kaiser Oakland's intake form (UX-6). Grievant

23   became sick with strep throat and called in sick every day. Saget never investigated that

24   illness.

25    The District's reliance on Grievant's failure to test on April 8 is misplaced. It is

26   unclear that was part of the extension agreement. In February, Grievant was not told of

27   that date. He thought he was on administrative leave for 120 days. Saget admitted she

28   never supplied Grievant that date in writing or what was expected of him, although

1   Grievant had requested a written deadline. Grievant acknowledged Saget orally told him

2   the deadline for the test was April 7 or 8. However, he was ill with strep throat at that

3   time and feared his pain medication injection received March 27 in the hospital would

4   effect the April 7 or 8 substance test resulting in his discharge. Further, Saget never

5   gave Grievant a <u>direct</u> order to submit for testing by April 8; never warned him that

6   failure to do so would result in discharge; and, never investigated Grievant's illness or

7   whether he could take the test at a later date.

8       According to Binkoff's letter[11] Saget intended to meet Grievant and advise a 6-

9   month residential treatment. Instead, Saget turned the matter over to Labor Relations

10   for disciplinary action resulting in this termination. She could have arranged Grievant's

11   continued treatment utilizing his non-District health coverage. She could have permitted

12   Grievant to take a later test. His test on April 12 was <u>negative</u>. He re-entered New Bridge

13   treatment and successfully completed treatment January 6, 2006 and has continued

14   after care with New Bridge. Grievant's participation in that New Bridge program has

15   been good with negative test results. He is scheduled to complete that program in

16   January 2007.

17                       **OPINION**

18       The District bears the burden of to demonstrate that just cause exists for

19   Grievant's discharge. Generally, the just cause standard requires persuasive proof that

20   the employee has violated the rules and/or policies alleged and, if so, under the totality

21   of circumstances, the penalty imposed is not excessive; i.e., outside the zone of

22   reasonableness for the proven misconduct. In addition, the just cause standard favors

23   progressive discipline which affords an employee the opportunity to modify behavior

24   before more severe discipline up to and including discharge is imposed. Progressive

25   discipline, however, does not have to always follow the oral warning, written warning,

26   suspension and discharge path in lockstep order. The facts and circumstances in each

27

28   [11]See, UX-2.

1  case determine the appropriate level of discipline. Moreover, progressive discipline

2  concepts do not apply in the face of gross misconduct warranting summary discharge

3  in the first instance.

4      At first glance, this appears to be another unfortunate substance abuse case

5  wherein an addicted employee was simply unable to comply with agreements

6  negotiated, and policies implemented, to save his job. Frankly, while not nearly as tragic,

7  this case has some overtones of the Arbitrator's 1988 *Patrick Miller* decision.[12]

8      On this record, there is no need to unduly lengthen the decision. Although it may

9  fall under the heading of "no good deed goes unpunished," Grievant was already in

10  violation of the Rehabilitation Agreement prior to the Union's February 16, 2005

11  intervention. Clearly, despite what each individual thought of the conversation, there

12  was, at least, confusion as to the end date of the additional 90 days to be used for

13  Grievant's rehabilitation. Thus, while it was "clear" to Saget, the evidence is

14  unpersuasive that both Grievant and Sanchez understood that the 90 days would begin

15  from the date of the Rehabilitation Agreement when he went into treatment.[13] Even

16  though it may have solved this particular problem, the Arbitrator does not suggest that

17  the District (Saget) was required to send Grievant and/or the Union a new notice which

18  specified the last possible date to take a return-to-work test. Here, the record

19  demonstrates that Grievant did not test – as he should have – on April 8, but less than

20  four days later, his test was negative.[14]

21

---

22  [12]See, Case No. 561-87. In *Patrick Miller*: (1) the Union signed the agreement at issue and (2) the parties
submitted a number of their prior drug related decisions wherein arbitrators either reinstated the employee

23  without back pay or sustained the discharge. *Patrick Miller* stands out in the Arbitrator's memory because,
although just cause for discharge was found, it is the only case in his 23 years that, in *dicta*, he suggested

24  that the District take another look at the situation because of the particularly tragic facts including, *inter alia*,
that grievant's completion of 11 1/2 months of a one-year last chance agreement without an unexcused

25  absence and, on Christmas Day, after he relapsed the night before, his wife took his child and car and
disappeared for a period of time.  Instead of coming to work on Christmas Day, Grievant said he was just

26  walking around looking for his family.  Subsequently, the family apparently got back together and grievant,
hopefully, conquered his addiction.

27  [13]The fact that Grievant acknowledged Saget told him to test by April 7 does not change this finding.

28  [14]See, UX-4.

1   Accordingly, given the confusion as to the end date, the Arbitrator finds that

2   Grievant, even with his record, deserves the benefit of the doubt under the just cause

3   standard. It should be clear to all, however, that the Arbitrator does <u>not</u> ignore the fact

4   that either failure to participate fully in a rehab program or failure to successfully

5   complete the program is usually grounds for termination. Redundantly, the confusion

6   stemming from the February 16 conference call is the principle reason just cause for

7   discharge cannot be found.[15]  Grievant shall be conditionally reinstated.

8   <u>Remedy</u>

9   As soon as possible after the Union's receipt of this Award, but not more than ten

10  (10) working days after receipt, Grievant shall submit verification of his successful

11  completion of the New Bridge aftercare program to the District. In addition, with at least

12  twenty-four (24) hours advance notice, Grievant must take, and pass, a return-to-work

13  substance test. Absent agreement of the parties, there can be no delay/postponement

14  in the date the District sets for the return-to-work test. If Grievant fails to comply with any

15  condition required for his reinstatement, his employment shall be terminated.

16  Finally, in this particular case, there will be no need for a "last chance" agreement

17  as this Award will constitute Grievant's last chance. Grievant shall be subject to random

18  testing by the District. If Grievant tests positive on any random test, his employment will

19  be terminated; provided, however, that if the Union files a grievance on Grievant's

20  behalf, the matter will be brought directly to the Arbitrator, wherein the <u>only</u> issue will be

21  whether Grievant was, in fact, "positive" for a controlled substance on a random drug

22  test. If so, just cause will be established for summary discharge.

23  The grievance is sustained in part and denied in part.

24  ### AWARD

25  1.   On this record, Grievant was not discharged by the District for just
26       cause. Grievant shall be conditionally reinstated to his former position
         under the terms set out in the above Remedy section, incorporated

27  _____

28  [15]So that there is no misunderstanding, the Arbitrator does not address the Section 2.1 issue in this decision.

herein by reference, and his improper discharge shall be converted to a disciplinary suspension without back pay or benefits, except seniority, from the date he was first removed from service to and including the last workday prior to his return to work.

2. If Grievant fails to submit the required verification in a timely fashion and/or is found positive on his return-to-work drug test, his employment with the District shall be terminated immediately. As noted above, this Award shall constitute Grievant's "last chance."

3. The Arbitrator retains jurisdiction over the matter for the sole and limited purpose of resolving disputes, if any, over remedy. As noted above, once re-employed, If Grievant is found positive on any random drug test, and the Union grieves on his behalf, the grievance shall be brought directly back to the Arbitrator and the <u>only</u> issue will be whether, in fact, Grievant's test was positive. If so, he will be discharged.[16]

DATED: July 24, 2006

ALEXANDER COHN - Arbitrator

---

[16]If Grievant complies with the conditions required for reinstatement, but is subsequently disciplined for any non-drug related reason, and a grievance is filed, the grievance is subject to the Agreement's grievance procedure; i.e., it would not fall within the Arbitrator's retained jurisdiction.

# NUETZEL EXHIBIT B

**ALEXANDER COHN, Esq.**

Labor and Employment Dispute Resolution

P.O. Box 4006 · Napa, CA 94558
707·226·7096
FAX 707·252·4067

East Coast Office:
3055 Foxhall Rd., N.W.
Washington, D.C. 20016
202·296·0599
Member, D.C. Bar

August 21, 2006

Anne I. Yen, Esq.
Van Bourg, Weinberg
1001 Marina Village Parkway, Suite 200
Alameda, CA 94501-1091

RE:    <u>BART</u> and <u>SEIU, Local 790</u>
       (Paul Melker; Post-Award Issue)

Dear Ms. Yen:

The Union has invoked my retained jurisdiction for what I understand is a remedy issue. Briefly, it is the Union's position that, had Grievant been working, he could have used his seniority for recall to a System Service position. On the other hand, as I understand it, the District's position is that, on November 15, 2004, Grievant bumped down to the Utility Worker classification where he remained until his May 27, 2005 discharge. The District, therefore, does not agree that Grievant, upon conditional reinstatement, should be in a System Service classification.

The District is correct. The Award required that Grievant be conditionally reinstated "to his former position..." The reinstatement was without back pay or benefits, except seniority. If the Award made Grievant whole for all, or perhaps part, of the time he was off work, he would have been eligible to use his seniority under certain conditions. However, Grievant was not subject to a "make whole" remedy for all or part of the time he was off work.

Accordingly, a conditional reinstatement (with unbroken seniority from the date he was removed from service) was to the classification in which he worked at the time of his discharge. Apparently, that was Utility Worker. Naturally, nothing in the Award prevents Grievant from exercising his accumulated seniority rights in the future.

Trusting this resolves the issue, I am

Very truly yours,

Alexander Cohn

By_____
       D. Bakker, Secretary

pc:    Matt Burrows, Esq., BART
       John Maher, SEIU
       Wilbur Wong, BART

Note: Dictated but not read to save time.

RECEIVED

AUG 24 2006

LEGAL DEPARTMENT

# NUETZEL EXHIBIT C

1                IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO

3                            ---oOo---

4

5     PAUL MELKER,                         COPY

6            Plaintiff,
                                    No. C07-03762 MMC
7     vs.

8     SAN FRANCISCO BAY AREA RAPID
      TRANSIT DISTRICT,
9
             Defendant.
10
      _____/
11

12

13

14

15

16               DEPOSITION OF PAUL MELKER

17

18            Taken before Beth Hirzel

19               CSR No. 10611

20              March 27, 2008          RECEIVED

21                                    APR 21 2008

22

23                                    LEGAL DEPT.

24         One Kaiser Plaza, Suite 505
                               Oakland, California 94612
25                             510/451-1580   Fax 510/451-3797

                               Certified Shorthand Reporters

2

1                          I N D E X

2                                                        PAGE

3    EXAMINATION BY MS. NUETZEL                            5

4

5                        E X H I B I T S

6                                                        PAGE

7    DEFENDANT'S

8    A        Amended notice of deposition              7

9    B        Letter to P. Melker from J. Baker         15
              dated 4/26/05
10
     C        Letter with attachments to E. Kurtz       15
11            from M. Cohen dated 9/19/06

12   D        Letter to P. Melker from M. Settles       26
              dated 7/15/03
13
     E        Unusual Occurrence Report                 57
14
     F        Handwritten statement (2 pages)           59
15
     G        Section II Substance Abuse Program        63
16            Testing Procedures

17   H        Rehabilitation agreement (2 copies)       72

18   I        Letter to P. Melker from J. Baker         108
              dated 4/26/05
19
     J        Letter to P. Melker from M. Settles       115
20            dated 5/27/05

21   K        Arbitrator's Opinion and Award            118

22   L        Letter to P. Melker from E. Kurtz         128
              dated 8/11/06
23
     M        Letter to A. Yen from A. Cohn             131
24            dated 8/21/06

25

              Aiken & Welch Reporters      Paul Melker    3-27-08

3

1  <u>DEFENDANT'S EXHIBIT</u>                                    <u>PAGE</u>

2  N      Handwritten and typed letter to        138
          M. Saget from P. Melker dated 12/19/06

3

   O      Letter to P. Melker from M. Saget      167
4         dated 12/21/06

5  P      Complaint of discrimination            175

6  Q      Job Description                        216

7  Attached but not marked: Pages 135 to 138 of contract.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          <u>DEPOSITION OF PAUL MELKER</u>

2

3          BE IT REMEMBERED, that pursuant to Notice and

4    on the 27th day of March 2008, commencing at the hour

5    of 10:05 a.m., at San Francisco Bay Area Rapid Transit

6    District, 300 Lakeside Drive,m 23rd Floor, Oakland,

7    California, before me, BETH HIRZEL, Certified Shorthand

8    Reporter, personally appeared PAUL MELKER, produced as

9    a witness in said action, and being by me first duly

10   sworn, was thereupon examined as a witness in said

11   cause.

12                    --oOo---

13

14          MICHAEL C. COHEN, Law Offices of

15   Michael C. Cohen, 1814 Franklin Street, Suite 900,

16   Oakland, California 94612, appeared as counsel on

17   behalf of the Plaintiff.

18

19          VICTORIA R. NUETZEL, Office of the General

20   Counsel, San Francisco Bay Area Rapid Transit District,

21   300 Lakeside Drive, 23rd Floor, Oakland, California

22   94612-3534, appeared as counsel on behalf of the

23   Defendant.

24

25          ALSO PRESENT:  Stephen J. Weglarz.

5

<u>PAUL MELKER,</u>

1

2          having been first duly sworn, was

3          examined and testified as follows:

4

5  <u>EXAMINATION BY MS. NUETZEL</u>:

6     Q.  Could you state your full name, please.

7     A.  Paul Lamont Melker.

8     Q.  Mr. Melker, have you ever had your deposition

9  taken before?

10     A.  No, I haven't.

11     Q.  I'm certain that you've had the opportunity to

12  go over the deposition and the procedures with your

13  attorney, but while we're on the record let me go over

14  some of the procedures with you so we're certain we're

15  both functioning on the same page.

16     As you know, you were just given an oath, and

17  deposition testimony is just that, it's testimony

18  that's given under oath.  And even though we're in

19  relatively informal surroundings the testimony you give

20  here today has the same force and effect as if you were

21  giving it in a court of law.

22     Do you understand that?

23     A.  I understand that.

24     Q.  The court reporter is taking down everything

25  that you, or I, or anyone else in the room says.  At

1      Q.  I believe you testified before that you thought

2  others who had less seniority than you had not been

3  laid off; is that what your concern was?

4      A.  That's what the seniority list showed.

5      Q.  That was the seniority list that you saw

6  sometime later?

7      A.  After I got into system service, I seen what

8  their seniority list looked like compared to ours as

9  far as District hire dates and who should have been

10  laid off.

11      Q.  As I understand it, you believe in 2002 that

12  system service workers with less seniority than utility

13  workers should have been laid off before utility

14  workers, and utility workers bumped to system service

15  worker?

16      A.  Yes.  Same way that we were bumped from utility

17  over -- excuse me, from system service -- 2004 from

18  system service over into car cleaning, we should have

19  been afforded the same opportunity to bump from car

20  cleaning to system service by way of District hire

21  date, and that didn't happen.

22      Q.  I'm just trying to understand this.

23      A.  Right.

24      Q.  Paragraph 4 says:  Steve Duff, M line

25  supervisor, is discriminating, harassing me because of

1   gender, and/or retaliation for my prior complaints of

2   discrimination, and/or my disability.

3         When was Steve Duff your supervisor?

4      A.  Steve Duff was my supervisor when I first was

5   recalled back to system service from utility in

6   October.

7      Q.  How long was he your supervisor?

8      A.  Roughly about four or five months.

9      Q.  Did you believe he was discriminating against

10  you during the four to five months that --

11     A.  Yes, I do.

12     Q.  How do you believe he was discriminating

13  against you?

14     A.  Based on my gender.

15     Q.  What form did that discrimination take?  What

16  happened that lead you to that belief?

17     A.  Well, he began moving me to Embarcadero from

18  Civic Center, which is my assigned station.  There were

19  two system service workers there, he gave me the bulk

20  of the work.

21        One of the other system service workers was a

22  female, and so he insisted on me doing the bulk of the

23  work.  It was more work than I could handle to begin

24  with, but he made a point to show up to the station two

25  and three times to monitor me and complain about what I

1    was missing, there's gum on the stairs, you know, you

2    missed a piece of trash downstairs.

3        You got to do -- you know, in other words, the

4    stations were split between the two system service

5    workers, but somehow or another he was assigning me to

6    go over and do work on her side of the station.

7        She had this little small corner of the station

8    to do, and I had not only the bulk of my side of the

9    station, but I had the lower platform which where the

10    trains pull in and out, not to mention where people

11    were coming upstairs to go upstairs.

12        I had about approximately seven stairs to

13    clean, she only had approximately three or four.  It

14    was an uneven distribution of the workload is what I'm

15    trying to say, to make a long story short.

16        The supervisor could modify the duties anytime

17    he wants to to make it an even workload if he sees

18    something going on.

19        So this took place for about a week on my

20    last -- for about a week or two on my last few weeks

21    there on the M line, which is San Francisco, before

22    prior to me moving to my next bidded area.  That lead

23    up to him writing me up.

24    Q.  Did you make any complaints to your union about

25    Mr. Duff's discrimination against you based on gender,

1    your perceived discrimination?

2        A.  Actually, we had -- like I said, he wrote me

3    up -- John Maher showed up, Bruce Crandall was there, a

4    union rep, we talked, we discussed it.  That's where I

5    complained that he had no complaints three or four

6    months prior to me working in system service.  He had

7    absolutely no complaints whatsoever.

8            His supervisor told me that she had no

9    complaints with me, but when she went on vacation all

10   of a sudden he has complaints, you know, and he's

11   moving me around.  I felt like he was harassing me,

12   period.

13       Q.  Other than the belief that he was harassing you

14   based on gender, do you believe he was harassing you

15   for any other reason?

16       A.  Yes, I believe he was discriminating on me and

17   harassing me based on my disability.

18       Q.  What lead you to that belief?

19       A.  I had reason to believe that superiors may have

20   possibly put him up to retaliate against me because of

21   my complaints.

22       Q.  What lead you to believe that?

23       A.  The way he was treating me.  He was treating me

24   differently, you know, particularly after his

25   supervisor left and went on vacation.  You know, he

1    begin to move me around a lot more than others.  He

2    begin to make complaints that he normally wouldn't

3    make.

4        Q.  You testified that you spoke with your union

5    representatives about this issue.  Did you go to any

6    department within BART to complain about Mr. Duff's

7    activities?

8        A.  No, no.

9        Q.  Are you aware that BART has an office of civil

10    rights?

11        A.  Yes, I am.

12        Q.  Did you make any attempt to contact the office

13    of civil rights to make a complaint about this

14    perceived harassment against you?

15        A.  No, I didn't.  One of the reasons is I trusted

16    my union, so I brought it to the union rep's attention,

17    and I brought it to John Maher's attention.  Eventually

18    it lead up to us having a meeting.  That's where I

19    wanted to start.  I wanted to use the chain of -- I

20    wanted to use my union, and that's where I started at.

21        Q.  After the meeting with the union did the

22    conditions improve?

23        A.  Yeah, because I moved.

24        Q.  You moved because another bid came up, right?

25        A.  Right.

Aiken & Welch Reporters       Paul Melker    3-27-08

1   STATE OF CALIFORNIA       )

2                            ) ss.

3   COUNTY OF ALAMEDA         )

4

5

6           I, BETH HIRZEL, do hereby certify:

7           That PAUL MELKER, in the foregoing deposition

8   named, was present and by me sworn as a witness in the

9   above-entitled action at the time and place therein

10  specified;

11          That said deposition was taken before me at

12  said time and place, and was taken down in shorthand by

13  me, a Certified Shorthand Reporter of the State of

14  California, and was thereafter transcribed into

15  typewriting, and that the foregoing transcript

16  constitutes a full, true and correct report of said

17  deposition and of the proceedings that took place;

18          IN WITNESS WHEREOF, I have hereunder subscribed

19  my hand this 7th day of April, 2008.

20

21

22                          *Beth Hirzel*

23                          BETH HIRZEL, CSR NO. 10611
                            State of California

24

25