1  Michael C. Cohen, Esq., Bar No. 65487
   **LAW OFFICES OF MICHAEL C. COHEN**
2  1814 Franklin Street, Suite 900
   Oakland, CA 94612
3  (510) 832-6436

4  Attorneys for Plaintiff
   Paul Melker

5

6

7

8
              IN THE UNITED STATES DISTRICT COURT
9
          NORTHER DISTRICT OF CALIFORNIA, SAN FRANCISCO
10

11

12

13

14  PAUL MELKER,
                                    Case No. C07-03762 MMC
15              Plaintiff,

16  vs.                             DECLARATION OF MICHAEL C.
                                    COHEN IN OPPOSITION TO SUMMARY
17  SAN FRANCISCO BAY AREA RAPID    JUDGMENT MOTION
    TRANSIT DISTRICT, aka BART,
18  DOES 1 to 10,                   Date: July 18, 2008
                                    Time: 9:30 a.m.
19              Defendants.         Courtroom: 7
    _____/
20

21
         I, Michael C. Cohen declare,
22
         1.  I am an attorney licensed to practice law before this
23
    Court.  I am the attorney of record for plaintiff, Paul Melker in
24
    this action.
25
         2.  Attached hereto, marked **Exhibit 8**, is a true and correct
26
    excerpt of the deposition testimony of Wilbur Wong, taken on
27

28  Declaration of Michael C. Cohen        -1-

1 | March 28, 2008

2 |     3.   Attached hereto, marked **Exhibit 9**, is a true and correct

3 | copy of the Arbitrator's Decision in the action herein.

4 |     4.   Attached hereto, marked **Exhibit 10**, is a true and

5 | correct copy of the complaint in the action herein.

6 |     I declare under penalty of perjury under the laws of the

7 | United States of America that the forgoing is true and correct,

8 | this declaration was executed in Oakland, California, is within

9 | my personal knowledge, and if called upon to testify I could and

10 | would testify competently thereto.

11 |

12 | Date:   June 12, 2008          LAW OFFICES OF MICHAEL C. COHEN

13 |

14 |

15 |                                Michael C. Cohen, Attorney
   |                                for Paul Melker

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 | Declaration of Michael C. Cohen          -2-

# EXHIBIT   7

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

PAUL MELKER,                          )
                                      )
            Plaintiff,                )
                                      )
    vs.                               )   No. C-07-3762
                                      )   MMC
SAN FRANCISCO BAY AREA RAPID          )
TRANSIT DISTRICT, et al.,             )
                                      )   CERTIFIED COPY
            Defendants.               )
                                      )


DEPOSITION OF

WILBUR WONG


March 28, 2008


BROOKS & OJEDA

1999 Harrison Street, Suite 680

Oakland, California 94612


REPORTED BY:  MARIA G. OJEDA, CSR 11221   JOB 13-407848B

WILBUR WONG     March 28, 2008

1          (Plaintiff's Exhibit 2 was marked for

2          identification)

3    BY MR. COHEN:

4          Q.  I'll show you what's been marked as Exhibit 2.

5    Tell me if you recognize this document.

6          A.  Yes, I recognize this document.

7          Q.  What is this document, Exhibit 2?

8          A.  It is a job posting to establish a pool of

9    candidates for system service workers.

10         Q.  And this job announcement to establish a pool,

11   let's see, the posted date is August 14, 2006; is that

12   correct?

13         A.  Yes.

14         Q.  And the closing date was what?

15         A.  September 1st.

16         Q.  Did you have anything -- did you participate

17   in causing this job announcement to be generated?

18         A.  No.

19         Q.  Okay.  Who was responsible for this?

20         A.  The hiring department.

21         Q.  What is your relationship to the hiring

22   department?

23         A.  No relation.

24         Q.  What about in terms of recalling employees is

25   there any interfacing with the department that

15

WILBUR WONG    March 28, 2008

1    Q.  Would you read it for me.

2    A.  It says he was hired as a part-time utility

3    worker on 3/12/01.  He became a full-time utility worker

4    on 9/24/01.  The code for utility worker is MA035.  And

5    the code for a system service worker is MA400.  He was

6    laid off as a utility worker on 7/1/02.  He was recalled

7    as a system service work are on 8/4/03.  He was bumped

8    to a utility worker position on 11/15/04.  And he was

9    discharged on 5/27/05.

10    Q.  And you created that?

11    A.  Yes.

12    Q.  When did you create it?

13    A.  Probably in the last couple of weeks.

14    Q.  And for what reason?

15    A.  Preparing for this case.

16    Q.  Okay.  And what is this document?

17    A.  This is a seniority roster for system service

18    workers.

19    Q.  Is it accurate?

20    A.  It's accurate in terms of what comes out from

21    the computer.

22    Q.  Do you have any reason to believe that it's

23    not accurate?

24    A.  No.

25    Q.  And what is this?

24

# EXHIBIT   8



ALEXANDER COHN
Arbitrator - Mediator
P.O. Box 4006
Napa, CA 94558.
(707) 226-7096

IN ARBITRATION PROCEEDINGS PURSUANT TO

AGREEMENT BETWEEN THE PARTIES

In the Matter of a Controversy     )
            between     )

**SERVICE EMPLOYEES INTERNATIONAL UNION,** )    **ARBITRATOR'S**
**LOCAL 790,**

            and     )    **OPINION AND AWARD**

**SAN FRANCISCO BAY AREA RAPID TRANSIT** )
**DISTRICT.**     )

Involving the discharge of Paul Melker, Grievant.  )
Case No. 910-06

This Arbitration arises pursuant to Agreement between SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 790, hereinafter referred to as the "Union," and the BAY AREA RAPID TRANSIT DISTRICT, hereinafter referred to as the "District," under which ALEXANDER COHN was selected to serve as sole, impartial Arbitrator and whose decision shall be final and binding upon the parties.

Hearing was held on April 26, 2006, in Oakland, California. The parties were afforded full opportunity for the examination and cross-examination of witnesses, the introduction of relevant exhibits and for closing argument. The Union argued its case orally at the end of the hearing outside the presence of the District and the Arbitrator. The District filed a post-hearing brief which was received on June 17, 2006, and the matter was submitted.

/ / /

/ / /

/ / /

1

BART 000072

1  APPEARANCES:

2     On behalf of the Union:

3        ANN YEN, Esquire, Van Bourg, Weinberg,
         1001 Marina Village Parkway, Suite 200,
4        Alameda, California 94501-1091

5     On behalf of the District:

6        MARCO GOMEZ, Esquire, Office of the
         General Counsel, BART, 300 Lakeside Drive,
7        P.O. Box 12688, Oakland, California 94604-
         2688.

8

9                          **ISSUE**

10     Whether the District discharged Grievant for just cause; and
       if not, what is the appropriate remedy?

11

12             **RELEVANT PROVISIONS OF AGREEMENT**

   Section 1.0.  Mutual Agreements

13
   1.1 Mutual Rights & Responsibilities

14
   ...Management has the duty to execute the traditional responsibilities of Management
15 to attain this goal and the Unions recognize the Management responsibilities.
   Management, in turn, recognizes its responsibility to treat employees fairly and
16 equitably.

17 1.5 The District agrees that, as a result of signing of this Agreement, rules or regulations
   or practices affecting employees beneficially will not be changed without mutual
18 agreement.

19     . . . .

20 2.1 Union Recognition

21 ... The District recognizes [the Union] as the sole and exclusive bargaining agent for
   employees in the Clerical and Maintenance Subunits...

22

23     . . . .

24                         **FACTS**

25     The salient facts are not in dispute. On March 12, 2001, Grievant was hired by

26 the District and, at the time of his discharge, was classified as a Transit Vehicle Car

27 Cleaner. On December 2, 2004, Grievant "self-referred" by going to Margaret Saget,

28 Senior Employee Services Representative, and advising her of his need for help

                                   2

BART  000073

1   because of his suffering a life with drugs.

2       The District has an alcohol and drug policy called the Substance Abuse Program

3   ("SAP"). Among other things, the SAP has Substance Abuse Testing Procedures[1]

4   which, in part, provide:

5       H.   VOLUNTARY SELF-REFERRAL FOR SUBSTANCE ABUSE
             REHABILITATION
6

7   An employee who has a drug and/or alcohol problem ... can voluntarily refer
    him/herself to the District's [SAP] for treatment through the Employee Services
    Manager. The Employee Services Manager will evaluate the employee and make
8   a specific determination of appropriate treatment. An employee pursuant to this
    program, who is in a rehabilitation or aftercare program, or who has completed
9   two (2) rehabilitation programs, may not elect further rehabilitation under this
    program.
10

11  PROCEDURES

12  1.   Once an employee voluntarily self refers, the Employee Services Manager
         will remove the employee from performing his/her job pending an
         evaluation. The employee will remain in a full pay status during the
13       evaluation and treatment program.

14  2.   Employee signs the Rehabilitation Agreement

15  . . .

16  9.   The employee must successfully adhere to the terms and conditions of the
         Rehabilitation Programs. If the employee violates the terms and conditions
17       of the Rehabilitation or Return to Work Agreement, the employee will be
         subject to disciplinary action in accordance with the terms of these
18       agreements.

19      On December 3, Grievant voluntarily entered the Rehabilitation Program. On

20  December 8, the District sent a 3-party Rehabilitation Agreement to Union President

21  Roxanne Sanchez. On December 13, Saget, for the District, and Grievant signed the

22  Rehabilitation Agreement. Neither Sanchez nor any other Union representative signed

23  it. The Rehabilitation Agreement provides:

24  This letter shall constitute a rehabilitation agreement between Mr. Paul Melker,
    Transit Vehicle Car Cleaner, SEIU Local 790, and the Bay Area Rapid Transit
25  District (hereinafter "Rehabilitation Agreement"), setting forth the terms and
    conditions of Paul Melker entering the District's Voluntary Substance Abuse
26  Rehabilitation Program on December 3, 2004.

27
    ───────────────────
28  [1]See, JX-G.

                                          3

BART  000074

I, [Grievant], <u>with the concurrence of my union representative</u>, agree to the following:

(1 )To execute appropriate authorizations for use and disclosure of medical information to permit the District's authorized treatment facility, New Bridge, to disclose my medical information to the District and to permit the District to disclose my medical information to [Saget], for the purposes of administering the [SAP] and determining my fitness for duty.

To keep such authorizations current during all phases of the [SAP] as it pertains to me, including the aftercare, monitoring and disciplinary phases, if any.

(2) I recognize that I have a chemical dependency problem. The Substance Abuse Rehabilitation Program of New Bridge has evaluated my particular circumstances, and has recommended that I be referred for Inpatient treatment to assist in my recovery.

(3) I agree to execute an admission agreement and to enter into New Bridge Rehabilitation Program on December 3, 2004; and to execute any treatment agreements required by the rehabilitation program, to fully adhere to the terms and conditions of the treatment agreements and to fully participate in the treatment program.

I understand that my treatment agreement is subject to reevaluation and/or modification by New Bridge with the concurrence of the Employee Services staff during the course of my treatment.

(4) Without limiting the foregoing, I agree to refrain from the use of all prohibited substances and alcohol under the program and to participate fully in all activities assigned or required by New Bridge as part of the treatment program including, but not limited to, individual, group and family counseling sessions, 12-step meetings, educational sessions and recreational and other activities as assigned. I agree to participate in case conferences which can be called at the request of the treatment staff, District Employee Services Manager, Senior Employee Services Representative or myself.

(5) I understand that my initial enrollment in the Rehabilitation Program will be for a four week period. I understand that the initial enrollment period may be extended by New Bridge <u>and approved by the District for up to an additional 90 days total</u>. However, I further understand that my entitlement to benefits under the Voluntary Rehabilitation Program is contingent upon my compliance with the Program and if in the judgement of the Rehabilitation Program staff or the District ESA, I fail to comply, my benefits under the District Program will be revoked.

(6) I agree to successfully complete the New Bridge Treatment Program, as evidenced by a final written evaluation to that effect to be furnished by New Bridge directly to the District.

(7) <u>I agree that anyone of the following shall be grounds for termination</u>, and the District may immediately suspend me without pay and without a prior hearing and implement discharge proceedings for:

- failure to participate fully in the New Bridge Rehabilitation Program
- failure to successfully complete the Program
- violation of any terms or conditions of the Treatment Contract

4

<u>Any such disciplinary action will be subject to the grievance procedure</u> of the Collective Bargaining Agreement.

(8) I understand that should I successfully complete the New Bridge Rehabilitation Program and should the District receive a written evaluation to that effect I will be expected to enter into a written agreement (Monitoring and Re-Entry Agreement) requiring adherence to aftercare and monitoring terms and conditions recommended by New Bridge and approved by the District's Employee Services Manager which may include, but not be limited to, periodic scheduled and unscheduled urinalysis for the presence of prohibited drugs or alcohol for a period of time recommended by the District's Employee Services Manager.

My ultimate return to work will be contingent upon my having successfully adhered to the terms of the Rehabilitation Agreement, testing negative on a return to work drug and alcohol test, being otherwise fit for duty and upon my entering into a written Return to Work Agreement which will provide that failure to adhere to its terms will result in termination of my employment with the District. (Emphasis added)

According to Grievant, Saget did not go over the Rehabilitation Agreement "line-by-line." Saget testified that they went over the Rehabilitation Agreement "line-by-line." Subsequently, the District determined that Grievant had not complied with the Rehabilitation Agreement. On April 26, 2005, Manager of Rolling Stock and Shops Jeff Baker wrote[2] Grievant notifying him of the District's intent to Discipline/Discharge him, stating in pertinent part:

Please be advised that pursuant to the Rehabilitation Agreement you signed with the District on December 13, 2004, you were required to adhere to all of the terms and conditions per Section C. 6 of the Rehabilitation Programs of the District's [SAP] as delineated in the Agreement. Having failed to have met those terms and conditions, as illustrated below:

1. After being granted a transfer to the Kaiser Treatment Program, you failed to participate fully in treatment activities or complete the Program;

2. You were absent from the Treatment Program without permission and without notifying the Senior Employee Services Representative beginning on March 21, 2005; and

3. You refused to take a Return to Work test by April 8, 2005, as required.

Section C. 6. of the Policy states:

The employee must successfully adhere to the terms and conditions of the rehabilitation and aftercare programs. If the employee violates the terms and conditions of the rehabilitation or aftercare program, the employee will be subject

---

[2]See, JX-C

BART   000076

1    to disciplinary action in accordance with the rehabilitation agreement, up to and
2    including discharge.

3    Due to the above-stated violations and pursuant to the state Policy, the District
     is seeking to terminate your employment.

4    On June 2, a grievance[3] was filed seeking Grievant's reinstatement. The

5    grievance alleged the discharge violated Sections 1.1, 1.5, 2.1 and all other applicable

6    sections of the Agreement. The grievance also asserted:

7        Grievant entered into an agreement with the District without notification or
         representation of Union, agreement states it was a 3 party Agreement, but there
8        was no Union concurrence. Grievant complied with return to work testing, but was
         refused due to lack of I.D. He returned the following day and passed, proving fit
9        for duty. The District unjustly discharged Grievant violating the Agreement, p. 3.

10   Saget oversees the SAP which, among other things, provides that: (1) the District

11   shall pay for the treatment of an employee making voluntary self-referral and continue

12   their salary; (2) such employees must sign a rehabilitation agreement about their

13   rehabilitation treatment; and, (3) upon returning to work, the employee must take a drug

14   and alcohol test. Saget testified that she is responsible for evaluating the employees

15   entering the SAP and assigning them the applicable level of rehabilitation care; that she

16   first saw Grievant when he self referred on December 2, 2004; that he had problems

17   with cocaine while in a Kaiser treatment program; that she evaluated him and

18   recommended that he participate in a residential program at New Bridge in Berkeley;

19   that Grievant agreed and started the next day; that, on December 13, she and Grievant

20   went over the rehabilitation agreement[4] "line-by- line" and he signed it; that he

21   expressed no questions or concerns about that agreement; that the New Bridge program

22   he was in was to last 28 days; and, that she received weekly reports from New Bridge

23   as to Grievant's participation.

24   Saget also testified that towards the end of December Grievant called her while

25   he was in New Bridge day treatment; that he requested a transfer into day treatment at

26   _____

27   [3]See, JX-B.

28   [4]See, JX-F

BART    000077

1    Kaiser because he felt he needed to be in a group that had more long term recovery

2    than those in the New Bridge program; that Grievant also wanted to spend more time

3    with his son; that she spoke to the New Bridge counselors and shared concerns about

4    his request; that New Bridge told her their concerns involved relationship issues

5    developing in his treatment involving another participant; that she discussed those

6    concerns with Grievant; that he denied those concerns; that she approved his transfer

7    to Kaiser; that she called Kaiser about his participation; and, that Kaiser

8    psychologist/counselor Jody Binkoff told her there were problems between Grievant and

9    another client and Kaiser wanted to discharge him from their program.

10    According to Saget, on February 2, 2005, she told Grievant he had completed

11    treatment and he should take a return to work substance test and go back to work; that

12    he agreed to take the test, but called her several days later saying he had relapsed and

13    had not taken the test; that she told him to wait a week for his system to be clean and

14    then take the test; that Grievant said he would; that based upon her office's paperwork

15    she determined Grievant did not take that test; that she called Grievant on or about

16    February 16 and told him he needed to take a return to work test; that Grievant angrily

17    told her she was trying to get him fired and hung up; that later that day she was called

18    by Sanchez (with Grievant on the line) , who said she needed her to give Grievant 90

19    days off under the SAP; that Grievant's position may be RIF'd; that Grievant had a

20    second job; that Grievant needed that opportunity to finish the treatment program; that

21    she told Sanchez Grievant had to be actually enrolled in a treatment program; that it was

22    ultimately agreed Grievant could stay off work if he was in treatment; that she advised

23    Grievant he could participate in a program run by New Bridge, or two run by Kaiser; and,

24    that Grievant selected the Kaiser program in Richmond.

25    Saget also testified Richmond Kaiser did not regularly supply her with information

26    about Grievant's treatment; that a counselor at Richmond Kaiser told her he went there

27    the first of March, but did not stay there long; that a Richmond Kaiser counselor told her

28    Grievant had transferred to Oakland Kaiser because he did not like the Richmond

7

BART  000078

1   services; that on March 27 she contacted Oakland Kaiser and was told by Binkoff that

2   Grievant had been there one day, March 18, but called in sick two days and has not

3   been heard from since; that she was never informed how many days he was in

4   treatment in Richmond; that she called Grievant and said his administrative leave of 90

5   days would be up April 7 and he needed to be tested so he could go back to work no

6   later than Monday, April 11; that Grievant said he would so comply; that Grievant called

7   April 4 and requested more time; that she told him she could not give him an extension

8   on the administrative leave and he needed to come in and be tested; that Grievant

9   called her April 5 and said if he could not get a leave of absence he thought he would

10  resign; that she said that would be fine; that Grievant called back that afternoon

11  demanding a letter stating the date he had to be tested; that she said she would not

12  send him a letter; that she told him he had to be tested by April 8, the last possible date;

13  that his return to work, based upon that test result, would be pushed back into the

14  middle of the following week; that Grievant did not come in for the test on April 8; that

15  she called Sanchez at the end of March to say they were having problems with Grievant;

16  that she called Sanchez April 11 or 12 and told her Grievant had not come in to be

17  tested and she was going to turn the matter over to Labor Relations; and, that she so

18  notified Labor Relations about Grievant not coming in to be tested April 8 .

19       According to Saget, it was not necessary to provide Grievant a letter setting the

20  return to work testing deadline because he was required to take the test when

21  requested; that by April 5 it was too late to send such a letter; that it was clear he had

22  to take the test by April 8; that she had told him that several times over the prior two

23  weeks; that there is no practice of providing such written notice; that the extension of the

24  date to April 8 was one day over his 90 day administrative leave; that leave was 90 days

25  from the date of the rehab agreement when he went into treatment; that Grievant was

26  not given a separate document setting that date; that the four week treatment was part

27  of the 90 day administrative leave; that the SAP clearly puts the administrative leave at

28  a maximum of 90 days; that Grievant came to see her after she had referred the matter

BART  000079

1  to Labor Relations; that she told him he should go into a long term treatment program;
2  that she did not recall discussing that matter with Binkoff; that her investigation of
3  Grievant's participation at Richmond Kaiser determined he called in sick twice and was
4  never heard of again; that meant he was not participating; that it was not necessary for
5  her to investigate his illness claim; that, since 2000, she was responsible for
6  administrating rehabilitation programs and took over the entire program in December
7  2004; that she was unaware of any employee having more than 90 days administrative
8  leave; and, that it may have happened.

9      Grievant testified that, In December, 2004, he had been in a Kaiser outpatient
10 chemical dependency program and was in satisfactory employment standing; that he
11 understood from Saget his administrative leave was four months; that when he
12 transferred to Kaiser Saget never said when his administrative leave would end; that he
13 successfully participated in Kaiser until February 4th, when he had a relapse; that he told
14 Saget about his relapse and needing more help and time; that Saget told him his
15 administrative leave was almost up; that she did not specify the end of that leave; that
16 he did not know he could use his own health insurance for a residential program and
17 Saget did not tell him; that he attended the Kaiser Richmond program sometime in
18 February 2005 for approximately three weeks after his relapse; and, on February 7,
19 2006, Binkoff sent a letter to Grievant which provided:

20      I am providing this letter at your request regarding your attendance at the CDRP
21 [Kaiser] .You came for a screening appointment on November 23, 2004 and
   attended Phase 1 of the Day Treatment program through November 30. You did
22 not enter Phase 2 on the Day Treatment program, but did leave a message that
   you planned to enter a residential treatment program offered through your
23 employer. On January 25, 2005 you came for another screening appointment
   and began Phase 1 of Day Treatment on January 26. You terminated your
24 treatment here on February 9 because you expected your health care coverage
   to change. On February 23 you reported that your EAP advised you to return to
25 treatment. You agreed to meet with her regarding referrals because returning to
   Oakland CDRP at that point was not clinically indicated. (Due to a conflict of
26 interest with another client here, our staff advised that you not attend the same
   facility at the same time) On March 16 you requested to restart Phase 1. On
27 March 17, our program director advised you that would be possible if the client
   with whom you had the conflict of interest was no longer in treatment here.
28 Otherwise, we advised you to continue at Kaiser Richmond where you reportedly
   had been in treatment for 3 weeks. On March 18, you were invited to start Phase

9

BART 000080

1 the next day. You did not attend on March 19, but did restart on March 21. On March 22 you called in sick and stated you planned to return on March 23. You did not return to CDRP after that. Your last attendance at CDRP was March 21, 2005 in Phase I of Day Treatment. With your consent, I spoke with your EAP on April 14 to provide her with the above information. She stated that she planned to meet with you to advise referral to a 6-month residential treatment program.[5]

Grievant further testified that after attending Richmond Kaiser he told Saget he needed to go into an inpatient program; that Saget told him his administrative leave was almost up, but did not specify the date that would occur, nor did she make any treatment suggestions; that, during the February conference call with Saget and Sanchez, Saget was unconcerned about his well being; that she said his leave was almost up and he had to return to work; that no return date was mentioned; that Saget said he could stay on leave if he was enrolled in a verifiable program; that arrangement was not made in writing; that the Union asked about his having more time to get into a program if Grievant paid for it; that Saget repeated his administrative leave was almost up; that the Binkoff reference in UX-2 to restarting phase 1 on March 16 was due to his relapse; and, that he signed a release for Saget to get information about that treatment.

On March 20, Saget signed a Kaiser substance abuse testing form.[6] Grievant testified that the stated reason for the testing on the form was "return to work"; that the form did not have either the date for testing or his date to return to work; that Saget told him on approximately March 22 the return to work test had to be by April 8; that he did not take the test April 8 because he was ill; that he was treated at Kaiser emergency room on March 27,[7] for strep throat with 600 mgs. ibuprofen every 8 hours and to return if condition worsened; that he remained ill until April 8 or 9 and he called in every day of that illness; that he was never asked for documentation of that illness; that he took

/ / /

---

[5]See, UX-2. According to Grievant, Binkoff's February 7 letter shows he attended the Kaiser Richmond program in February 2005 for approximately three weeks.

[6]See, UX-4.

[7]See, UX-3

BART 000081

1    a return to work test on April 12, which was reported negative[8]; that he never said he did

2    not want to complete his rehabilitation nor did he ever say he did not want to return to

3    work with the District; and, that he re-entered the New Bridge program in December

4    2005 as a result of receiving benefits at his other employer Summit Alta Bates.

5        According to Grievant, Saget did not give him a direct order to take the test April

6    7 or 8. He testified that she never told him if he did not take the test it would be

7    considered insubordination; that she never told him he would lose his job if he took the

8    test later; that in reference to the April 7 or 8 deadline Saget said "the administrative

9    leave is almost up, you are going to have to take a return to duty analysis testing"; that

10   at the end of the February 16 conference call he did not have any understanding when

11   his leave would be over; that he still believed it was four months based on what Saget

12   had first told him back in December; and, that he was afraid that the medication he had

13   been given by the emergency room on March 27 would throw off his return to work test

14   results.

15        Grievant further testified that he stopped going to Kaiser Oakland in the beginning

16   of February 2005 because of a conflict with another patient there; that later in February

17   Saget talked about his return to duty test, which he told the Union about; that he did not

18   think Saget was denying him the ability to get back into treatment after his relapse; that

19   after he left Kaiser Oakland, he went to Kaiser Richmond; that he was in Kaiser

20   Richmond at the time of the February 16 conference call with the Sanchez and Saget;

21   that during that phone call Saget gave him no treatment options; that he made the

22   transfer from Oakland to Richmond without talking about it first with either Saget or

23   anyone in District management; that he told Saget about his transfer during the February

24   16 conference call; that, in that conversation, Saget told him he had to remain in

25   treatment; that he later transferred back to Kaiser Oakland; that, contrary to her

26   testimony, he talked to Saget about that transfer; that he showed up about three days

27

28   ───────────────
     [8]See, UX-4.

11        BART  000082

in March at Kaiser Oakland, when he was not sick; that Saget told him he had to take a return test by April 7; that she never extended it to April 8; that on December 13 Saget said he had 4 months administrative leave; that she did not go over the Rehabilitation Agreement with him line-by-line; that during the February 16 conference call Sanchez asked Saget to give him the 90 days he was entitled to under the SAP; and, that Saget agreed so long as he was in rehabilitation.

Grievant also testified that along with the ibuprofen he was given a shot by the emergency room doctor on March 27 for his pain; that he did not know what the drug(s) were in that shot; that his pain from then on kept him from taking the return to work test on April 7 or 8; that he is unfamiliar with ibuprofen; that he knows "it is a pain killer, which is probably a narcotic"; that Saget did not allow him to tell her that the prescription medication would keep him from taking the test; that his other job did not provide a paid EAP like the District's; that he did not have any benefits at the other job; and, that all his benefits were through the District.

On April 19, 2006, New Bridge Aftercare Counselor Teresa Allen sent Union Counsel Ann Yen a letter[9] stating that Grievant "successfully completed 28 days of chemical dependency treatment" on January 6, 2006; that Grievant "now regularly attends aftercare sessions; that "his drug screen tests have all been negative"; and, that Grievant is scheduled to graduate from the aftercare program in January 2007.

### POSITION OF DISTRICT

The grievance should be denied because Grievant was discharged for just cause. Grievant was given <u>numerous</u> opportunities to participate and comply with the SAP. He is not entitled to an additional chance. He had four months of paid administrative leave during this period, during which he had wilful transgressions, which cannot be ignored.

Grievant violated his treatment program. After completing and being discharged from his Kaiser treatment, Grievant, who had been on administrative leave since

---

[9] See, UX-1.

BART 000083

1  December 4, 2004, was directed by Saget on February 2, 2005, to prepare to return to

2  work including a return to work drug test. Although, Grievant agreed , a few days later

3  he called Saget saying he had relapsed. Saget advised he could take the drug test a

4  week later to let his system clear of any drugs. Grievant told Saget he would and again

5  failed to take the drug test. His failure to take that test violated the SAP and his

6  Rehabilitation Agreement. Grievant was given another chance as a result of the Union's

7  intervention on his behalf and Saget agreed to his going back into actual, verifiable

8  rehabilitation participation. Saget gave him the choice of Kaiser Richmond or another

9  rehabilitation program. Grievant choose Kaiser, but by March 3, he transferred to Kaiser

10  Oakland, without informing her. Saget found out he participated one day at Kaiser

11  Oakland, called in sick and never participated there again.

12        The SAP requires that Grievant adhere to the terms of his Rehabilitation

13  Agreement (JX-G, H (8) ). It also provides that Saget determines the rehabilitation. By

14  unilaterally changing his treatment and wilfully failing to go to rehabilitation, Grievant

15  failed to comply with the terms of his participation under both the SAP and the

16  Rehabilitation Agreement. Saget did not then seek his discharge, but sought to get him

17  back to work. Grievant admitted that, on March 22, 2005, Saget told him his

18  administrative leave was running out and he had to take a return to work drug test April

19  7 in order to be timely under the program. Although scheduled for the test, Grievant did

20  not take it as scheduled, but unilaterally changed the date and took it days after that

21  deadline.

22        Grievant's excuses are not credible. He blamed Saget as unhelpful. He has

23  refused to accept responsibility. His assertion Saget said his leave was 4 months is false

24  and a means to avoid the April 7 drug test. The Rehabilitation Agreement was gone over

25  line by line with Grievant by Saget. It provides 90 days as the maximum leave period.

26  The SAP has a similar provision. That was reiterated by Sanchez in his presence is her

27  oral agreement with Saget giving Grievant another chance. Grievant failed to comply

28  with the terms of his treatment. He lied about the length of his treatment at Kaiser

13

1    Oakland in March. He said he did not take his April 7 testing because he had been sick

2    with strep throat. He changed that excuse to his treatment with ibuprofen and a shot for

3    that illness, which somehow would adversely effect his drug test results. At the time, he

4    did not tell Saget of those problems.

5        Any Union request for mitigation should be denied. There is no requirement in the

6    SAP, mutually agreed to by the parties, requiring the Union to sign the Rehabilitation

7    Agreement. Rather, the SAP provides the employee signs the Rehabilitation Agreement.

8    It was sent to the Union in letter form consistent with years of practice. Grievant's post

9    discharge rehabilitation participation should not be considered as mitigation grounds.

10   He had many rehabilitation opportunities in the District program. He was terminated for

11   wilfully not complying with his obligations in the District program.

12

13                          **POSITION OF UNION**

14       The grievance must be sustained and Grievant reinstated and made whole[10]

15   because the District has failed to demonstrate the discharge was for just cause. Grievant

16   voluntarily referred himself into the SAP. He should not be treated as if he was on his

17   last chance. The District should have cooperated more with him to help him recover from

18   his addition.

19       Grievant did not violate the terms of his Rehabilitation Agreement. That

20   agreement provided for a 4-week period of rehabilitation, which could be extended up

21   to an additional 90 days. Grievant completed the 28 day residential New Bridge

22   program. That was followed by a 17 day out patient program at New Bridge for a total

23   of 45 days. Therefore, Grievant complied with paragraph 6 of the agreement. Paragraph

24   7 stated grounds for termination would include failure to fully participate or successfully

25   complete the New Bridge program or violation of any terms or conditions of the

26   treatment agreement. He complied with all those provisions.

27

28   [10]In addition, interest should be awarded.

14

BART  000085

There was an oral extension to that agreement between the Union (Sanchez), Saget and Grievant to continue Grievant on administrative leave while he participated in further rehabilitation. Those terms were unclear and, therefore, cannot constitute just cause for Grievant's termination. It was unclear how long Grievant could remain on administrative leave while in treatment. Grievant understood Saget had earlier told him in December his administrative leave was for 120 days. That is contrary to the District position such leave could not be longer than 90 days. Saget conceded there may have been <u>longer</u> rehabilitation leaves for employees in the past. Paragraph 5 of the Rehabilitation Agreement indicates, consistent with Grievant's testimony, the total leave could be 120 days if 4 weeks were added to the 90-day extension.

The extension agreement was unclear as to the beginning and ending dates of Grievant's leave, nor was Grievant ever provided such information. It was unclear as to what Grievant was expected to do other than stay in treatment. Also, it was unclear what information Grievant was to provide Saget as opposed to the information Kaiser was to supply her. Grievant did stay in treatment within the reasonable purpose and meaning of the oral extension. He spent three weeks in Richmond Kaiser. He suffered a relapse and was not in treatment every day between February 16 and April 26. He told Saget of that relapse and asked for her help. She should have been more cooperative and provided him assistance because he had voluntarily self referred.

After attending Richmond Kaiser for three weeks in February/March he attended more than one day in Kaiser Oakland, although Kaiser's records show only one days attendance. On March 16 he completed Kaiser Oakland's intake form (UX-6). Grievant became sick with strep throat and called in sick every day. Saget never investigated that illness.

The District's reliance on Grievant's failure to test on April 8 is misplaced. It is unclear that was part of the extension agreement. In February, Grievant was not told of that date. He thought he was on administrative leave for 120 days. Saget admitted she never supplied Grievant that date in writing or what was expected of him, although

BART 000086

1  Grievant had requested a written deadline. Grievant acknowledged Saget orally told him

2  the deadline for the test was April 7 or 8. However, he was ill with strep throat at that

3  time and feared his pain medication injection received March 27 in the hospital would

4  effect the April 7 or 8 substance test resulting in his discharge. Further, Saget never

5  gave Grievant a <u>direct</u> order to submit for testing by April 8; never warned him that

6  failure to do so would result in discharge; and, never investigated Grievant's illness or

7  whether he could take the test at a later date.

8      According to Binkoff's letter[11] Saget intended to meet Grievant and advise a 6-

9  month residential treatment. Instead, Saget turned the matter over to Labor Relations

10  for disciplinary action resulting in this termination. She could have arranged Grievant's

11  continued treatment utilizing his non-District health coverage. She could have permitted

12  Grievant to take a later test. His test on April 12 was <u>negative</u>. He re-entered New Bridge

13  treatment and successfully completed treatment January 6, 2006 and has continued

14  after care with New Bridge. Grievant's participation in that New Bridge program has

15  been good with negative test results. He is scheduled to complete that program in

16  January 2007.

17                              **OPINION**

18      The District bears the burden of to demonstrate that just cause exists for

19  Grievant's discharge. Generally, the just cause standard requires persuasive proof that

20  the employee has violated the rules and/or policies alleged and, if so, under the totality

21  of circumstances, the penalty imposed is not excessive; i.e., outside the zone of

22  reasonableness for the proven misconduct. In addition, the just cause standard favors

23  progressive discipline which affords an employee the opportunity to modify behavior

24  before more severe discipline up to and including discharge is imposed. Progressive

25  discipline, however, does not have to always follow the oral warning, written warning,

26  suspension and discharge path in lockstep order. The facts and circumstances in each

27

28  [11]See, UX-2.

BART   000087

1 case determine the appropriate level of discipline. Moreover, progressive discipline
2 concepts do not apply in the face of gross misconduct warranting summary discharge
3 in the first instance.

4     At first glance, this appears to be another unfortunate substance abuse case
5 wherein an addicted employee was simply unable to comply with agreements
6 negotiated, and policies implemented, to save his job. Frankly, while not nearly as tragic,
7 this case has some overtones of the Arbitrator's 1988 *Patrick Miller* decision.[12]

8     On this record, there is no need to unduly lengthen the decision. Although it may
9 fall under the heading of "no good deed goes unpunished," Grievant was already in
10 violation of the Rehabilitation Agreement prior to the Union's February 16, 2005
11 intervention. Clearly, despite what each individual thought of the conversation, there
12 was, at least, confusion as to the end date of the additional 90 days to be used for
13 Grievant's rehabilitation. Thus, while it was "clear" to Saget, the evidence is
14 unpersuasive that both Grievant and Sanchez understood that the 90 days would begin
15 from the date of the Rehabilitation Agreement when he went into treatment.[13] Even
16 though it may have solved this particular problem, the Arbitrator does not suggest that
17 the District (Saget) was required to send Grievant and/or the Union a new notice which
18 specified the last possible date to take a return-to-work test. Here, the record
19 demonstrates that Grievant did not test – as he should have – on April 8, but less than
20 four days later, his test was negative.[14]

21 _____

22 [12]See, Case No. 561-87. In *Patrick Miller*: (1) the Union signed the agreement at issue and (2) the parties
submitted a number of their prior drug related decisions wherein arbitrators either reinstated the employee
23 without back pay or sustained the discharge. *Patrick Miller* stands out in the Arbitrator's memory because,
although just cause for discharge was found, it is the only case in his 23 years that, in *dicta*, he suggested
24 that the District take another look at the situation because of the particularly tragic facts including, *inter alia*,
that grievant's completion of 11 1/2 months of a one-year last chance agreement without an unexcused
25 absence and, on Christmas Day, after he relapsed the night before, his wife took his child and car and
disappeared for a period of time. Instead of coming to work on Christmas Day, Grievant said he was just
26 walking around looking for his family. Subsequently, the family apparently got back together and grievant,
hopefully, conquered his addiction.

27 [13]The fact that Grievant acknowledged Saget told him to test by April 7 does not change this finding.

28 [14]See, UX-4.

BART 000088

1    Accordingly, given the confusion as to the end date, the Arbitrator finds that
2    Grievant, even with his record, deserves the benefit of the doubt under the just cause
3    standard. It should be clear to all, however, that the Arbitrator does <u>not</u> ignore the fact
4    that either failure to participate fully in a rehab program or failure to successfully
5    complete the program is usually grounds for termination. Redundantly, the confusion
6    stemming from the February 16 conference call is the principle reason just cause for
7    discharge cannot be found.[15]  Grievant shall be conditionally reinstated.

8    <u>Remedy</u>

9    As soon as possible after the Union's receipt of this Award, but not more than ten
10   (10) working days after receipt, Grievant shall submit verification of his successful
11   completion of the New Bridge aftercare program to the District. In addition, with at least
12   twenty-four (24) hours advance notice, Grievant must take, and pass, a return-to-work
13   substance test. Absent agreement of the parties, there can be no delay/postponement
14   in the date the District sets for the return-to-work test. If Grievant fails to comply with any
15   condition required for his reinstatement, his employment shall be terminated.

16   Finally, in this particular case, there will be no need for a "last chance" agreement
17   as this Award will constitute Grievant's last chance. Grievant shall be subject to random
18   testing by the District. If Grievant tests positive on any random test, his employment will
19   be terminated; provided, however, that if the Union files a grievance on Grievant's
20   behalf, the matter will be brought directly to the Arbitrator, wherein the <u>only</u> issue will be
21   whether Grievant was, in fact, "positive" for a controlled substance on a random drug
22   test. If so, just cause will be established for summary discharge.

23   The grievance is sustained in part and denied in part.

24                                  **AWARD**

25   1.    On this record, Grievant was not discharged by the District for just
         cause. Grievant shall be conditionally reinstated to his former position
26       under the terms set out in the above Remedy section, incorporated

27   ────────────────────────────

28   [15]So that there is no misunderstanding, the Arbitrator does not address the Section 2.1 issue in this
     decision.

                                    18            **BART  000089**

herein by reference, and his improper discharge shall be converted to a disciplinary suspension without back pay or benefits, except seniority, from the date he was first removed from service to and including the last workday prior to his return to work.

2. If Grievant fails to submit the required verification in a timely fashion and/or is found positive on his return-to-work drug test, his employment with the District shall be terminated immediately. As noted above, this Award shall constitute Grievant's "last chance."

3. The Arbitrator retains jurisdiction over the matter for the sole and limited purpose of resolving disputes, if any, over remedy. As noted above, once re-employed, If Grievant is found positive on any random drug test, and the Union grieves on his behalf, the grievance shall be brought directly back to the Arbitrator and the <u>only</u> issue will be whether, in fact, Grievant's test was positive. If so, he will be discharged.[16]

DATED: July 24, 2006


ALEXANDER COHN - Arbitrator

---

[16]If Grievant complies with the conditions required for reinstatement, but is subsequently disciplined for any non-drug related reason, and a grievance is filed, the grievance is subject to the Agreement's grievance procedure; i.e., it would not fall within the Arbitrator's retained jurisdiction.

19

BART 000090

EXHIBIT  9



1  Michael C. Cohen, Esq., Bar No. 65487
**LAW OFFICES OF MICHAEL C. COHEN**
2  1814 Franklin Street, Suite 900
Oakland, CA 94612
3  (510) 832-6436

4  Attorneys for Plaintiff



FILED
ALAMEDA COUNTY

MAY 17 2007

CLERK OF THE SUPERIOR COURT

BY _____
                      DEPUTY

5

6

7              SUPERIOR COURT OF CALIFORNIA COUNTY OF ALAMEDA

8                        UNLIMITED JURISDICTION

9

10  PAUL MELKER,                    Case No.  RG07326472

11            Plaintiff,

12  vs.                             COMPLAINT FOR VIOLATION OF
                                    STATE STATUTES PROHIBITING
13  SAN FRANCISCO BAY AREA RAPID    EMPLOYMENT DISCRIMINATION,
    TRANSIT DISTRICT, aka BART,     VIOLATION OF TITLE VII OF THE
14  DOES 1 to 10,                   CIVIL RIGHTS ACT OF 1964, AS
                                    AMENDED, WRONGFUL TERMINATION
15            Defendants.           IN VIOLATION OF PUBLIC POLICY,
                                   / BREACH OF IMPLIED COVENANT OF
16  _____     GOOD FAITH AND FAIR DEALING,
                                    BREACH OF CONTRACT
17
                                    **DEMAND FOR JURY TRIAL**
18

19                        **GENERAL ALLEGATIONS**

20       Plaintiff, Paul Melker, alleges:

21       1.  Plaintiff Paul Melker (hereinafter referred to as

22  "plaintiff") is an African American adult man, who at all

23  relevant times lived and worked in the county of Alameda, state

24  of California.

25       2.  Defendant San Francisco Bay Area Rapid Transit District,

26  aka BART (hereinafter referred to as "BART")is a Transit

27  District, situated in Alameda county, State of California, and

28                              -1-

1 operating in Alameda County.  Said entity is subject to suit

2 under the California Fair Employment and Housing Act, Government

3 Code §12900 et seq., in that defendant is an employer who at all

4 relevant times regularly employed more than fifty (50) people.

5     3.    BART is subject suit under Title VII of the Civil

6 Rights Act of 1964, as amended.

7     4.  Plaintiff is ignorant of the true names and capacities

8 of the defendants sued herein as DOES 1 to 10, inclusive and

9 therefore sues these defendants by such fictitious names.

10 Plaintiff will amend this complaint to allege their true names

11 and capacities when ascertained.  Plaintiff is informed and

12 believes and thereon alleges that each of the fictitiously named

13 defendants is responsible as hereinafter shown for the

14 occurrences and injuries alleged in this complaint.

15     5.  Plaintiff is informed and believes, and thereon alleges,

16 that at all times herein mentioned, each DOE, defendant named

17 herein was the agent and/or employee of the remaining DOE

18 defendants, and in doing the things hereinafter alleged, was

19 acting within the course and scope of such agency and/or

20 employment.

21     6.  The unlawful employment practices complained of herein

22 occurred in Alameda County, state of California.

23     7.  Plaintiff is a person protected by the California Fair

24 Employment and Housing Act, Government Code §§ 12926, 12940 et

25 seq., in that he is an African American man, and or a disabled

26 employee.

27     8.  Plaintiff is a person protected by Title VII of the

28                                             -2-

1   Civil Rights Act of 1964, as amended.

2       9.   Plaintiff began working for defendant on or about March

3   12, 2001.  He worked as a Systems Service Worker for BART and he

4   has performed all of his duties, and the conditions of said

5   employment, with reasonable competence, consistent with the

6   practices and policies of BART, from that time until he was laid

7   off work because of reduction in BART's work force.

8       10.   BART recalled plaintiff to return to work on or about

9   July 15, 2003.  From July 2003 until November 2004, plaintiff

10  worked for BART, in a permanent position in "System Service".

11  In November 2004, BART had another reduction in its work force.

12  At that time, BART allowed plaintiff an election to have his

13  employment terminated with recall rights for eighteen (18)

14  months; or to stay employed with BART and "bump" to another job

15  classification, with indefinite recall rights to his job as a

16  Systems Service Worker.  Plaintiff elected to stay employed with

17  BART and "bump" into to a position as a "Utility Worker".

18      11.   On May 27, 2005, BART terminated plaintiff's employment

19  because of plaintiff's disability.  Plaintiff was disabled at

20  that time because of a mental and substance addiction.  At the

21  time BART terminated plaintiff's employment, plaintiff was able

22  to perform the essential duties of his job with or without a

23  reasonable accommodation.

24      12.   Plaintiff developed a chemical dependency in 2004.

25  He notified BART of his chemical dependency and requested BART to

26  reasonably accommodate him by allowing him to participate in

27  BART's employee assistance chemical dependency program.

28                              -3-

13.  At the time of plaintiff's request, BART had a practice and a policy of reasonably accommodating its employees who were chemically dependent by allowing the employee(s) to participate in a chemical dependency program.

14.  BART accommodated plaintiff by allowing plaintiff to participate in a chemical dependency program, aka drug rehabilitation program.

15.  After plaintiff started participating in the drug rehabilitation program, he relapsed by resuming his use of the chemical to which he had become dependent.  The nature of chemical dependency is such that it is reasonably anticipated that person(s) suffering from chemical dependency might relapse, and that a relapse is reasonably anticipated to affect the employees participation in the program.  BART's practice and policy, at that time, was to allow its employees who were chemically dependent, "second chance", if the employee(s) relapsed after starting the drug rehabilitation program.

16.  Plaintiff, notified BART in or about February 2005, that he had relapsed and he requested BART to give him a second chance to complete the drug rehabilitation program.

17.  BART denied plaintiff a "second chance", in violation of its own policies and or past practices.

18.  BART failed and refused to reasonably accommodate plaintiff by refusing to give plaintiff a "second chance".

20.  In April 2005, BART put a photograph of plaintiff in plain eye view in BART stations, with a statement saying this man is on administrative leave and has violated BART's drug and

-4-

1   alcohol policy and should be approached with caution.  If you see

2   this man call BART police.

3       21.  On or about May 27, 2005, BART unlawfully terminated

4   plaintiff's employment.

5       22.  BART, when it terminated plaintiff's employment treated

6   plaintiff differently than it had treated non African American

7   employees, and or female employees, who were suffering from

8   chemical dependency.

9       23.  BART discriminated against plaintiff because of

10  plaintiff's disability, (mental and substance addiction) when it

11  terminated plaintiff's employment.

12      24.  Plaintiff filed a complaint with the Department of Fair

13  Employment & Housing Department, (hereinafter referred to as

14  "DFEH"), after BART terminated his employment.  A copy of

15  plaintiff's DFEH complaint is marked Exhibit A, attached hereto

16  and incorporated herein by this reference.

17      25.  Plaintiff filed a grievance with his union after BART

18  terminated his employment.  Following an arbitration hearing, the

19  arbitrator ordered BART to reinstate plaintiff to plaintiff's

20  former position with BART, with unbroken seniority.

21      26.  On or about August 15, 2006, when BART reinstated

22  plaintiff's employment, BART reinstated plaintiff to work as a

23  "Utility Worker".  At that time there were positions open in

24  "System Service".

25      27.  Plaintiff had been employed by BART for five years when

26  BART reinstated him.  However, BART reinstated him at a fourth

27  year pay rate instead of a fifth year pay rate.  When plaintiff

28                              -5-

1    first requested BART to transfer him to "System Service", because

2    of his seniority on the job.  BART refused to do so.  BART placed

3    plaintiff in job assignments that have caused plaintiff's work

4    schedule, his home schedule and his drug recovery schedule to be

5    unstable.

6      28.  Plaintiff filed a complaint with Equal Employment

7    Opportunity Commission, (hereinafter referred to as EEOC; and

8    with DFEH, against BART, because of BART's conduct toward him.  A

9    copy of said complaints are marked Exhibit B, attached hereto and

10   incorporated herein by this reference.

11     29.  Plaintiff is informed and believed and thereon alleges

12   that the actions and failure to act alleged herein was carried

13   out by managerial employees of BART acting in the course and

14   scope of such agency and/or employment.

15     30.  At all relevant times, BART, knew or should have known

16   that its employees and or managerial employee(s), were

17   discriminating against plaintiff because of plaintiff's race,

18   disability, and or retaliating against plaintiff because of

19   plaintiff's prior complaints and that said conduct was unlawful

20   discrimination and or harassing.

21     31.  The actions and failures to act of BART and or DOES

22   1 to 5, inclusive, and each of them, were severe and pervasive

23   such that it created a hostile work environment for plaintiff.

24     32.  BART and DOES 1 to 5, inclusive, and each of them,

25   despite knowledge and or adequate opportunity to learn of the

26   misconduct of its agents and or employees, retained said

27   defendants, agents and or employees in its service, and

28                                    -6-

1    thereafter adopted, approved and ratified the acts, omissions and

2    misconduct of said defendants.

3        33.  As a proximate cause of the alleged acts of BART and

4    or DOES 1 to 5, inclusive's, and each of them, plaintiff has

5    suffered emotional distress, loss of income and will continue to

6    suffer emotional distress in the future and lose income in the

7    future income loss, wage loss, incur medical and hospital

8    expenses, and other incidental and out-of pocket expenses, all to

9    plaintiff's damage in an amount to be shown according to proof.

10       34.  Plaintiff hereby demands a jury trial.

11                    **FIRST CAUSE OF ACTION**
              **VIOLATION OF GOVERNMENT CODE §12940 et seq.**

12

13       35.  Plaintiff realleges and incorporates by reference

     Paragraphs 1 through 32 of the Complaint as though fully set

14   forth at length herein.

15

16       36.  BART and or Does 1 to 10, and each of them, violated

     plaintiff's legal rights by doing the acts complained of herein;

17   said acts included but are not limited to:

18

19       a. Discriminating against plaintiff on the job because of

     plaintiff's race and or disability and or in retaliation for

20   plaintiff's prior complaints of discrimination;

21

22       b. Harassing plaintiff on the job by creating a hostile work

     environment for plaintiff, because of plaintiff's race, and or

23   gender and or disability and or in retaliation for plaintiff's

24   prior complaints of discrimination;

25

26       c. Denying plaintiff employment opportunities because of his

     race, and or gender and or disability and or in retaliation for

27

28                                 -7-

1    plaintiff's prior complaints of discrimination;

2         d. Failing to take all reasonable immediate and appropriate

3    corrective action to remedy the unlawful employment harassment

4    and/or discrimination and or retaliation;

5         e. Failing to take all reasonable steps necessary to prevent

6    unlawful discrimination and or harassment and or retaliation from

7    occurring on the job;

8         f. Failing to reasonably accommodate plaintiff for

9    plaintiff's disability;

10        g. Terminating plaintiff's employment, because of

11   plaintiff's disability, and or race and or gender.

12        h. Retaliating against plaintiff for plaintiff's prior

13   complaints of discrimination.

14        37.   In doing each and all of the acts alleged herein, said

15   BART and or its agents and or employees, acted intentionally,

16   willfully, and without justification, attempted to and did

17   deprive Plaintiff of his rights, privileges and immunities

18   secured to her by the Constitution and laws of the State of

19   California, particularly his right to be free from discrimination

20   and/or harassment in employment on the grounds of race as

21   provided by Government Code §§ 12920, 12921, 12940, et seq., and

22   Title VII of the Civil Rights Act of 1964, as amended.

23        38.   Plaintiff exhausted his administrative remedy prior to

24   filing his lawsuit herein.

25        39.   Plaintiff received a Right To Sue Letter from DFEH, and

26   then filed his lawsuit herein within one year from the date of

27   his Right To Sue Letter.  A copy of the Right To Sue Letter is

28                                   -8-

1 marked as Exhibit C and Exhibit C-1 and incorporated herein by

2 this reference.

3    40.  BART's conduct proximately caused plaintiff to retain

4 an attorney to represent him and incur attorney fees.  The amount

5 of attorney fees has not been fully determined at this time; the

6 amount of attorney fees will be shown according to proof at the

7 time of trial.

8    41.  BART's conduct and or the conduct of each defendant,

9 alleged herein proximately cause plaintiff to lose income, and

10 employment benefits, and suffer emotional distress, mental

11 anguish, anxiety and worry, and incur attorney fees, and is

12 reasonably certain to proximately cause plaintiff to lose income

13 and suffer emotional distress, mental anguish, anxiety and worry,

14 and incur attorney fees, in the future all to plaintiff's damage

15 in an amount to be shown according to proof.

16    42.  The conduct of BART, and or each defendant, alleged

17 herein was willful, wanton, malicious, and oppressive, in that

18 defendant knew or should have known that its conduct was

19 unreasonable and or illegal.  Furthermore, defendant's acts were

20 carried out in willful and conscious disregard of plaintiff's

21 rights and well-being such as to constitute malicious, despicable

22 conduct within the meaning of California Civil Code §3294,

23 entitling plaintiff to punitive damages in an amount appropriate

24 to punish or make an example of BART.

25                    **SECOND CAUSE OF ACTION**
      **VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF**
26    **1964, AS AMENDED**

27    43.  Plaintiff realleges, and incorporates by reference,

28                            -9-

1 | Paragraphs 1 through 42 of the Complaint as though fully set
2 | forth at length herein.

3 |     44.  Plaintiff in doing the acts and failing to act as
4 | alleged herein violated Title VII of the Civil Rights Act of
5 | 1964, as amended.

6 |     45.  Plaintiff filed a timely complaint with EEOC against
7 | BART.  A copy of his EEOC complaint is marked Exhibit B, and
8 | incorporated herein by this reference.

9 |     46.  Plaintiff filed his complaint within ninety days of
10 | receipt of his Right To Sue Letter from EEOC.  A copy of his
11 | Right To Sue Letter I marked as Exhibit D attached hereto and
12 | incorporated herein by this reference.

13 | **THIRD CAUSE OF ACTION**
14 | **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
**GOVERNMENT CODE §§ 12920, 12921**

15 |     47.  Plaintiff realleges, and incorporates by reference,
16 | Paragraphs 1 through 44 of the Complaint as though fully set
17 | forth at length herein.

18 |     48.  BART's conduct alleged herein violated Government Code
19 | section 12920 & 12921.

20 | **FOURTH CAUSE OF ACTION**
21 | **BREACH OF THE IMPLIED COVENANT OF GOOD**
**FAITH AND FAIR DEALING**

22 |     49.  Plaintiff realleges, and incorporates by reference,
23 | Paragraphs 1 through 46 of the Complaint as though fully set
24 | forth at length herein.

25 |     50.  Into every employment contract there is an implied
26 | covenant of good faith and fair dealing requiring each party to
27 | the agreement to refrain from acting in a manner which will

28 | -10-

1   unfairly deprive the other party from the benefit of the bargain.

2       51.  BART breached the implied covenant of good faith and

3   fair dealing by doing the acts and failing to act, as alleged in

4   this complaint.

5       52.  As a direct proximate cause of defendants' breach of

6   said implied contract, plaintiff has lost income and sustained

7   damages in an amount to be shown at the time of trial.  It is

8   reasonably certain that plaintiff will lose additional income in

9   the future.

10                      **FIFTH CAUSE OF ACTION**
                        **BREACH OF CONTRACT**

11

12      53.  Plaintiff realleges and incorporates by reference

13  Paragraphs 1 through 52 of the Complaint as though fully set

14  forth at length herein.

15      54.  Plaintiff, at all times alleged herein this cause of

16  action was a member of a union.  The union to which plaintiff was

17  a member had entered into a written agreement with BART for the

18  benefit of its members and BART employees.

19      55.  The essential terms the written agreement required BART

20  to pay plaintiff based on plaintiff's seniority with BART.

21      56.  BART has breached the union agreement as set

22  forth my EEOC complaint dated January 25, 2007.  Said complaint

23  is marked exhibit D, attached hereto and incorporated herein by

24  this reference.

25      57.  Plaintiff complained to the union that BART was

26  breaching the union agreement regarding its conduct toward

27  plaintiff's rights to be paid at the rate for 5 year employees

28                              -11-

1 | instead of at the rate for 4 year employees.

2     58.  Plaintiff's union failed to take all reasonable action

3 | to enforce the union agreement on behalf of plaintiff.

4     59.  Plaintiff has been forced to file this action for

5 | breach of the union contract because his union has failed to take

6 | all reasonable action to enforce the union agreement on his

7 | behalf.

8                         **PRAYER**

9     **WHEREFORE**, Plaintiff prays for judgement against all

10 | Defendants, and each of them as follows:

11     1.  Compensatory and special damages, including damages for

12 | mental and emotional distress, in an amount to be determined at

13 | the time of trial;

14     2.  Lost income, past and future;

15     3.  Punitive and exemplary damages in an amount appropriate

16 | to punish and/or make an example of the Defendants sued

17 | individually herein to be determined at trial;

18     4.  Reasonable attorney fees;

19     5.  Costs of suit incurred herein;

20     6.  Prejudgment interest at the legal rate on the amount of

21 | Plaintiff's lost wages and employment benefits; and

22     7.  Such other and further relief as the Court deems just

23 | and proper.

24 | Dated: May 17, 2005            LAW OFFICES OF MICHAEL C. COHEN

25

26                       By: *Michael C. Cohen*

27                       MICHAEL C. COHEN,
                          Attorney for Plaintiff

28                     -12-



# * * * EMPLOYMENT * * *

**COMPLAINT OF DISCRIMINATION UNDER THE PROVISIONS OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**

DFEH # _____

EEOC # _____

If dual-filed with EEOC, this form may be affected by the Privacy Act of 1974.

## CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING and EEOC

COMPLAINANT'S NAME (Indicate Mr. or Ms.)
MELKER, PAUL LAMONT

| ADDRESS | TELEPHONE NUMBER (INCLUDE AREA C |
|---|---|
| 255 MacArthur Bl #205 | (510) 302-7826 |

| CITY | STATE | ZIP | COUNTY | COUNTY CODE |
|---|---|---|---|---|
| Oakland | CA | 94610 | Alameda | 001 |

NAMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICES COMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

NAME
B. A. R. T.

| ADDRESS | TELEPHONE NUMBER (INCLUDE AREA C |
|---|---|
| 300 Lakeside Dr | (510) 464-6000 |

| CITY | STATE | ZIP | COUNTY | COUNTY CODE |
|---|---|---|---|---|
| Oakland | CA | 94612 | Alameda | 001 |

CAUSE OF DISCRIMINATION BASED ON (CHECK APPROPRIATE BOX[ES])
☐ RACE  ☐ SEX  ☑ DISABILITY  ☐ RELIGION  ☐ NATIONAL ORIGIN/ANCESTRY  ☐ DENIAL OF FAMILY/MEDICAL LEAVE  ☐ SEXUAL ORIENTATION
☐ COLOR  ☐ AGE  ☐ MARITAL STATUS  ☐ MEDICAL CONDITION (cancer or genetic characteristics)☐ OTHER (SPECIFY) _____

| NO. OF EMPLOYEES/MEMBERS | DATE MOST RECENT OR CONTINUING DISCRIMINATION | RESPONDENT |
|---|---|---|
| CODE   1000 | TOOK PLACE (month, day, and year) May 27, 2005 | 73 |

THE PARTICULARS ARE:

I.    On May 27, 2005, I was terminated. On March 12, 2001, I was hired as a Utility Worker. At th time of the termination, I was earning $2,400 per month.

II.   Mr. Michael Settles, Human Resource Manager, told me, "I was terminated after I failed to complete a substance abuse rehabilitation program."

III.  I believe I was terminated on the basis of my disability (mental and substance addiction). My belief is based on the following:

A.  In or about December, 2004, I voluntarily participated in a supervised New Bridge Drug Rehabilitation program. The program was scheduled for approximately three (3) to four (4) months.

B.  In or about January, 2005, I was transferred to Kaiser Permanente rehabilitation program.

C.  On or about March 27, 2005, I sustained a temporary medical condition and received emergency medical services.

D.  On or about March 28, 2005, I notified my Rehabilitation Counselor Jeffrey Blair that I received medical treatment which required time off from the program for seven (7) days. Apparently, there was miscommunication between my rehabilitation counselor and my employer. However, I called Mr. Blair on a daily basis to report the status of my medical condition.

Exhibit A

Page 1 of 2

# * * * EMPLOYMEN * *



**COMPLAINT OF DISCRIMINATION UNDER
THE PROVISIONS OF THE CALIFORNIA
FAIR EMPLOYMENT AND HOUSING ACT**

DFEH # _____

EEOC # _____

COMPLAINANT'S NAME(S) (indicate Mr. or Ms.)

MELKER, PAUL LAMONT

RESPONDENT'S NAME

B A R T

THE PARTICULARS ARE:

 

E.  In or about March, 2005, Drug and Alcohol Manager, Margaret Saget, notified me prior t
the completion of my rehabilitation program that it was time to take the Return to Work te
and a return to work.

F.  On April 12, 2005, I successfully passed the Return to Work test.

G.  On May 27, 2005, I was terminated.



RECEIVED

FEB 10 2006

Department of Fair
Employment and Housing
Oakland District Office

Page 2 of 2

TYPED AND MAILED December 7, 2005

☐ I also want this charge filed with the Federal Equal Employment Opportunity Commission (EEOC).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own
knowledge except as to matters stated on my information and belief, and as to those matters I believe it to be true.

Dated  *2/10/06*

                                 COMPLAINANT'S SIGNATURE

At  *OAKLAND*

        City

DFEH-300-01 (12/99)        O:TS:ss               DATE FILED:

DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING                      STATE OF CALIFORNIA

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION COMPLAINT AGAINST SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING COMPLAINT AGAINST SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

COMPLAINANT:        CHARGING PARTY: Melker, Paul
Paul Melker           EEOC CHARGE # 555-2007-00303
2105 McGee Avenue    RESPONDENT: Paul Melker v. Bay Area Rapid Transit District
Berkeley, CA 94703
tele. No. 510-302-7836
SS# 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

**RECEIVED**

**JAN 2 5 2007**

**EEOC-OLO**

ADDRESS WHERE NOTICES ARE TO BE SENT:
Michael C. Cohen
Law Offices of Michael C. Cohen
1814 Franklin Street, Suite 900
Oakland, CA 94612
tele. NO. 510-832-6436

SUBJECT: Employment discrimination, harassment based on disability, gender, retaliation, failure to reasonably accommodate

EMPLOYER:
San Francisco Bay Area Rapid Transit District, aka BART.
300 Lakeside Drive
Oakland, CA 94604-2688

JOB TITLE: System Services

    San Francisco Bay Area Rapid Transit District, (hereinafter referred to as "BART") discriminated against me and harassed me on the job because of my race, and or gender and or my disability. My disability is my chemical dependency to drugs and alcohol. I am one year into recovery from my chemical dependency. BART has also been retaliating against me because of the prior disability discrimination claim I filed against BART when BART terminated my employment because of my disability on May 27, 2005.

    After BART terminated my employment on May 27, 2005, I filed a grievance with my union and a complaint with DFEH for discrimination. Following the union arbitration hearing, the arbitrator ordered BART to reinstate me to my former position with BART, with unbroken seniority. Prior to BART terminating my employment, from July 2003 until July 2004, I worked for BART, in a permanent position in "System Service". In July 2004, because of a reduction in force at BART, I was reassigned to work in "Utility", with recall rights. On or about August 15, 2006, when BART reinstated my employment, BART reinstated me to work as a "Utility Worker". At that time there were positions open in "System Service". I have been employed by BART for five years. However, BART reinstated me at a fourth year pay rate instead of a fifth year pay rate. When I first requested BART to transfer me to "System Service", because of my seniority, BART refused to do so. BART has placed me in job assignments that have caused my work, home and recovery schedule to be unstable.

Exhibit B

EEOC CHARGE # 555-2007-00303
CHARGING PARTY: MELKER, Paul
RESPONDENT: Bay Area Rapid Transit District

Paul Melker
Complaint against BART with EEOC & DFEH
Page 2

**Complaints Against BART For BART Conduct Occurring After The Date I Filed My Prior EEOC & DFEH Complaints Against BART:**

The following conduct was done BART to discriminate/harass me because of my disability, and or prior complaints and or gender, and or retaliation for prior complaints of discrimination:

1. BART has discriminated against me when in interpreting and applying its "return to work seniority policy". In the past, when other BART employees were laid off by BART because of a reduction in force and subsequently reinstated, BART did not change their seniority date to the date they were reinstated to the job. BART interpreted its policy to mean that their seniority continued unbroken as though the employee had never been laid off. When I was laid off by BART because of a reduction in force and subsequently reinstated to the job, BART changed my seniority date to start from the date of my reinstatement to the job. BART interpreted its policy to mean that my seniority was broken as of the date I was laid off, and then started as of the date I was reinstated to the job. BART's differential treatment is based on race, and or retaliation for filing prior complaints of discrimination, and or discrimination based on my disability and or gender;

2. BART's differential treatment regarding my "seniority" and the way BART is applying its policy about "seniority" when employee is laid off and recalled to work is discrimination based on race, and or retaliation for filing prior complaints of discrimination, and or discrimination based on his disability;

3. I recently discovered that back in 2002, I was laid off from work out of seniority order;

4. Steve Duff, M line supervisor, is discriminating/harassing me because of gender, and or retaliation for my prior complaints of discrimination and or my disability. He required me to do 90% of the work and assigned a female co-worker who was worked in my same classification and job designation, and job assignment to do only 10% of the work designated for both of us to do. He gave me an unfair "write up". He waited until the last week I was scheduled to work at the Powell street station and then gave me a "wright up". He did not complain about my work performance for 3 months prior;

5. Failure to reasonably accommodate and or retaliation : After the arbitrator issued a finding that I was fired from my job without just cause, the arbitrator required BART to reinstate me to my job, and required me to meet with Margaret Saget, BART's Employee Services Representative, and to participate in a substance abuse program. When I met with Ms. Saget after I was reinstated to the job, she gave me a consent to test form to sign. At that time she did not inform me that I needed to sign a written agreement to abide by all its terms and conditions in order to avail myself of its benefits, while I was continuing to participate in New Bridge after care program.
At the time BART unlawfully terminated my employment I had been participating in BART's substance abuse program and attending New Bridge after care program. Ms. Saget should have informed me that I

RECEIVED

JAN 2 6 2007

EEOC - OLO

EEOC CHARGE # 555-2007-00303
CHARGING PARTY: MELKER, Paul
RESPONDENT: Bay Area Rapid Transit District

Paul Melker
Complaint against BART with EEOC and DFEH
Page 3

needed to sign a new agreement to abide by the terms and conditions in order to avail myself of its benefits given but she only gave him a consent to test form to sign. Ms Saget and or BART treated me differently than it treated other similarly situated BART employees, because of my disability, and in retaliation for my prior complaints of discrimination, and retaliation, and failed and refused to reasonably accommodate me for my disability. BART failed to reasonably participate in and or engage with me in an interactive process to reasonably accommodate me for my disability;

6.    BART has altered my seniority date and pay on several occasions to discriminate against me because of my disability and in retaliation for my prior complaints of discrimination;

7.    BART has been paying me less than I am entitled to be paid based on my seniority in relation to other employees reasonably similarly situated, and performing similar work.;

8.    As of October 2006, I have been working in System Services. However, I am still being paid approximately $21.00, per hr., which is what a "utility worker" earns and I should be paid approximately $26.00 per hr., which is MW1, (Maintenance Worker 1 pay)Utility ;

9.    BART has been under paying me since 2003;

10.    BART has been altering my classification seniority date & district hire date.

11.    BART laid me off work out of order.

I declare under penalty of perjury, pursuant to the laws of the State of California and laws of the United States of America, that the statements herein are true and correct and that this declaration was executed in Oakland, California on January 25, 2007.

Paul Melker

RECEIVED

JAN 2 6 2007

EEOC - OLO



STATE OF CALIFORNIA - STATE AND CONSUMER SERVICES AGENCY

ARNOLD SCHWARZENEGGER, Governor

## DEPARTMENT OF FAIR EMPLOYMENT & HOUSING

1515 Clay Street, Suite 701, Oakland, CA 94612
(510) 622-2941 TTY (800) 700-2320 Fax (510) 622-2951
www.dfeh.ca.gov



January 16, 2007

PAUL LAMONT MELKER
2105 Mckee Avenue
Berkeley, CA 94703

RE:    E200506M1158-00-p
       MELKER/SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT

Dear PAUL LAMONT MELKER:

### NOTICE OF CASE CLOSURE

The consultant assigned to handle the above-referenced discrimination complaint that was filed with the Department of Fair Employment and Housing (DFEH) has recommended that the case be closed on the basis of: Complainant Elected Court Action.

Please be advised that this recommendation has been accepted and the case has been closed effective January 16, 2007.

This letter is also your Right-To-Sue Notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. This is also applicable to DFEH complaints that are filed under, and allege a violation of Government Code section 12948 which incorporates Civil Code sections 51, 51.7, and 54. The civil action must be filed within one year from the date of this letter. However, if your civil complaint alleges a violation of Civil Code section 51, 51.7, or 54, you should consult an attorney about the applicable statutes of limitation. If a settlement agreement has been signed resolving the complaint, it is likely that your right to file a private lawsuit may have been waived.

Exhibit C

Notice of Case Closure
Page Two

DFEH does not retain case files beyond three years after a complaint is filed, unless the case is still open at the end of the three-year period.

Sincerely,

*Allan H. Pederson*

Allan H. Pederson
District Administrator

cc:    Case File

Sharon C. Moore
Principal Administrative Analyst
SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT
300 Lakeside Dr POB 12688
Oakland, CA  94604-2688

DFEH-200-08 (06/08)
MLONGINS

STATE OF CALIFORNIA – State and Consumer Services Agency                                           ARNOLD SCHWARZENEGGER, Governor

# DEPARTMENT OF FAIR EMPLOYMENT & HOUSING
(SEE ADDRESS CHECKED BELOW)



TTY # (800) 700-2320

☐  1001 Tower Way, Suite 250
   Bakersfield, CA 93309
H  (661) 395-2729

☐  1320 E. Shaw Avenue, Suite 150
   Fresno, CA 93710
C  (559) 244-4760

☐  611 West Sixth Street, Suite 1500
   Los Angeles, CA 90017
S/T (213) 439-6799

☒  1515 Clay Street, Suite 701
   Oakland, CA 94612
M  (510) 622-2941

☐  2000 "O" Street, Suite 120
   Sacramento, CA 95814
E  (916) 445-5523

☐  1350 Front Street, Suite 3005
   San Diego, CA 92101
D  (619) 645-2681

☐  San Francisco District Office
   1515 Clay Street, Suite 701
A  Oakland, CA 94612
   (510) 622-2973

☐  111 North Market Street, Suite 810
   San Jose, CA 95113
G  (408) 277-1277

☐  2101 East Fourth Street, Suite 255-B
   Santa Ana, CA 92705
K  (714) 558-4266

| | |
|---|---|
| **EEOC Number:** | **555-2007-00303** |
| **Case Name:** | **Paul Melker v. Bay Area Rapid Transit District** |
| **Date:** | **January 26, 2007** |

### NOTICE TO COMPLAINANT AND RESPONDENT

This is to advise you that the above-referenced complaint is being referred to the California Department of Fair Employment and Housing (DFEH) by the U.S. Equal Employment Opportunity Commission (EEOC). The complaint will be filed in accordance with California Government Code section 12960. This notice constitutes service pursuant to Government Code section 12962.

<u>No response to the DFEH is required by the respondent.</u>

The EEOC will be responsible for the processing of this complaint. DFEH will not be conducting an investigation into this matter. EEOC should be contacted directly for any discussion of the charge. DFEH is closing its case on the basis of "processing waived to another agency."

### NOTICE TO COMPLAINANT OF RIGHT-TO-SUE

Since DFEH will not be issuing an accusation, this letter is also your right-to-sue notice. According to Government Code section 12965, subdivision (b), you may bring a civil action under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The lawsuit may be filed in a State of California Superior or Justice Court. Government Code section 12965, subdivision (b), provides that such a civil action must be brought within one year from the date of this notice. Pursuant to Government Code section 12965, subdivision (d)(1), this one-year period will be tolled during the pendency of the EEOC's investigation of your complaint. You should consult an attorney to determine with accuracy the date by which a civil action must be filed. This right to file a civil action may be waived in the event a settlement agreement is signed. Questions about the right to file under federal law should be referred to the EEOC.

The DFEH does not retain case records beyond three years after a complaint is filed.

<u>Remember: This Right-To-Sue Notice allows you to file a private lawsuit in State court.</u>

Sincerely,

WANDA J. KIRBY
Chief Deputy Director

                                        Exhibit C-1                    DFEH 200-03 (07/05)



**U.S. Department of Justice**

Civil Rights Division

NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

CERTIFIED MAIL
5068 2200

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

March 7, 2007

Mr. Paul Melker
c/o Michael C. Cohen, Esquire
Law Offices of Michael C. Cohen
Attorney at Law
1814 Franklin St., Ste. 900
Oakland, CA  94612

Re:  EEOC Charge Against San Francisco Bay Area Rapid Transit District
     No. 555200700303

Dear Mr. Melker:

Because you filed the above charge with the Equal Employment
Opportunity Commission, and the Commission has determined that it
will not be able to investigate and conciliate that charge within
180 days of the date the Commission assumed jurisdiction over the
charge and the Department has determined that it will not file any
lawsuit(s) based thereon within that time, and because you through
your attorney have specifically requested this Notice, you are
hereby notified that you have the right to institute a civil action
under Title VII of the Civil Rights Act of 1964, as amended, 42
U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be
filed in the appropriate Court within 90 days of your receipt of
this Notice.

This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is
meritorious.

Sincerely,

Wan J. Kim
Assistant Attorney General
Civil Rights Division

by   *Karen S. Ferguson*

Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc:  Oakland Local Office, EEOC
     San Francisco Bay Area Rapid Transit District

Exhibit D